## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DEBORAH (DC) C. BROIL** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Case No. 2:24-cv-02029** |
| ) | |
| **STATE OF KANSAS, KANSAS BUREAU** ) | |
| **OF INVESTIGATION AND ITS** ) | **WITH JURY TRIAL DEMAND** |
| **REPRESENTATIVES** ) | |
| *Serve:* ) | |
| **Attorney General Kris W. Kobach** ) | |
| **120 SW 10TH Avenue, 2nd Floor** ) | |
| **Topeka, KS  66612** ) | |
| ) | |
| ) | |
| *Defendant.* ) | |

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff Deborah (DC) C. Broil, by counsel, states the following as her Second Amended Complaint against Defendant State of Kansas, Kansas Bureau of Investigation and its Representatives.

## INTRODUCTION

This is an action brought pursuant to Title VII for Count I, II, and III, seeking equitable and monetary relief as remedy for Defendant's unlawful employment practices. As pled below, Defendant unlawfully subjected Plaintiff to sex discrimination, retaliation, and continued retaliatory harassment resulting in a hostile work environment.  The discrimination and retaliation culminated in her wrongful termination for complaining both internally and externally about discrimination and harassment.

## JURISDICTION AND VENUE

1.      Plaintiff files this complaint asserting claims under federal laws, and federal jurisdiction exists under Title VII for Counts I, II, and III.

2.      Venue is proper because the cause of action arose and the discriminatory actions giving rise to the claims occurred in Kansas where Plaintiff was employed.

## PARTIES AND ADMINISTRATIVE EXHAUSTION OF REMEDIES

3.      Plaintiff is a Black, African American female.  She is a former employee of Defendant.

4.      Defendant Kansas Bureau of Investigation is a Kansas state government agency and has a primary place of business located at 1620 Tyler Street, in Topeka, Kansas.

## ADMINISTRATIVE PROCEDURES

5.      On May 5, 2022, Plaintiff timely filed amended her Charge of Discrimination (Charge No. 43751-22 and 28D-2022-00496) with the Kansas Human Rights Commission (KHRC) and Equal Employment Opportunity Commission (EEOC), alleging that Plaintiff was subjected to ongoing, continued age discrimination, race and color discrimination, sex discrimination, harassment, and retaliation.  After complaining about such discrimination and harassment, she was retaliated against and suffered from a retaliatory hostile work environment. In her Charge of Discrimination, Plaintiff complained about discrimination, harassment, and retaliation that is the subject of this lawsuit; alternatively, all conduct alleged in this Complaint would have arisen from the investigation of such Charge.

6.      On May 31, 2022, Plaintiff amended her Charge of Discrimination (Charge No. 43751-22 and 28D-2022-00496) with the Kansas Human Rights Commission (KHRC) and Equal Employment Opportunity Commission (EEOC), alleging that Plaintiff was subjected to ongoing,

continued age discrimination, race and color discrimination, sex discrimination, harassment, and retaliation.  After complaining about such discrimination and harassment, she was retaliated against and suffered from a retaliatory hostile work environment.  In her Charge of Discrimination, Plaintiff complained about discrimination, harassment, and retaliation that is the subject of this lawsuit; alternatively, all conduct alleged in this Complaint would have arisen from the investigation of such Charge.

7.      On February 9, 2023, Plaintiff timely filed a Charge of Discrimination (Charge No. 44495-23 and 28D-2023-00374 with the Kansas Human Rights Commission (KHRC) and Equal Employment Opportunity Commission (EEOC), alleging that Plaintiff was subjected to ongoing, continued age discrimination, race and color discrimination, sex discrimination and harassment as well as retaliation, which culminated in the wrongful termination of Plaintiff's employment.  In her Charge of Discrimination, Plaintiff complained about discrimination, harassment, and retaliation that is the subject of this lawsuit; alternatively, all conduct alleged in this Complaint would have arisen from the investigation of such Charge.

8.      On October 24, 2023, the EEOC issued its Notice of Right to Sue, stating that Plaintiff is entitled to file a civil action related to her complaints of discrimination and retaliation.

9.      Plaintiff has fulfilled all conditions precedent to bringing this claim and has duly exhausted all administrative procedures prior to instituting this lawsuit, which is being commenced within ninety days of the date on which the EEOC issued to Plaintiff her Notice of Right to Sue.

10.     Plaintiff initiated this lawsuit on January 22, 2024.

## FACTUAL BACKGROUND

11.     Plaintiff is a Black/African American female. She is 76 years old. She was employed by Defendant from April 29, 2019, to December 5, 2022. She was employed as a

Forensic Scientist III and worked at Defendant's Kansas Bureau of Investigation Topeka Forensics Lab.

12.     As a Forensic Scientist III, working in the Forensic Chemistry Laboratory, Plaintiff analyzed unknown chemical substances. Her primary job duties included performing analyses of unknown chemical substances suspected of being illegal substances, authoring reports concerning the analyses, peer reviewing her colleagues' reports, and testifying in her expert capacity in criminal prosecutions concerning those analyses.

13.     In 2019, Plaintiff's supervisor at the time, Dwain Worley at the time created her original training program, based on Plaintiff's years of experience (more than 13 years) and pursuant to KBI policy.  Plaintiff completed the required training, passed the training and testing before receiving her work authorization. Worley was approximately aged 59-62 when Plaintiff was hired; he retired the following year in 2020.

14.     Plaintiff was treated less favorably than her colleagues, denied opportunities, and was more closely scrutinized than her colleagues because of her race, sex, color, ancestry, and age. Plaintiff also suffered retaliation for her complaints of discrimination and retaliation. Rules, standards, and regulations were unfairly applied to Plaintiff. This discrimination, harassment, and retaliation began in May of 2021 and continued through her termination on December 5, 2022. This ongoing harassment created a hostile work environment.

15.     Early in May 2021, Schieferecke left a DVD movie on the Complainant's desk for her to watch." The movie was sexually explicit and offensive. It involved the main character having sex with a minor female and prostitutes. There was a scene in the moving where the main character is discussing engaging in bestiality.

16.     Plaintiff was upset, humiliated, insulted, and disgusted by the movie.

17.    Plaintiff reported Schieferecke giving her sexually offensive movie to the Assistant Lab Director, Mary Henderson. Henderson refused to address it with Schieferecke and claimed she, Henderson, could not speak about this with Schieferecke because Hendersson had to work with Schieferecke. Schieferecke

18.    The Plaintiff was denied a complaint form from Human Resources to submit a written complaint about the hostile experiences in the work environment. Later on, during a meeting with her Supervisor, HR Director, and Assistant Lab Director Plaintiff was told by the HR Director that she was revising a new form and would provide the plaintiff with the form when the revision was completed.

19.    Schieferecke and Plaintiff shared instrument Hp-6 beginning in 2019. In late May 2021, Schieferecke yelled at Plaintiff that he would use whatever instrument he wants and will not ask to use an instrument. Schieferecke threatened her that if she asked him to get off Hp-6, she would NEVER receive help from him with instrument repairs. It was Schieferecke's job to maintain all Chemistry Department instruments, and Plaintiff did not have the expertise to fix/repair GC/MS instruments. This was reported to Christa Knox ("Knox"), Chemistry Supervisor, that same day. Knox admitted that Schieferecke had also yelled at her as well and admitted that Schieferecke yelling or raising his voice at his colleagues may "perhaps" create a hostile work environment for that employee.

20.    Forensic Scientist Beth Royel testified that Schieferecke had yelled at her and disrespected her.

21.    Comparatively, male Forensic Chemists Patrick Porubsky and Chris Riddle were never yelled at or treated disrespectfully by Schieferecke.

22.    When Plaintiff returned to work on May 24, 2021, Schieferecke would not greet

Plaintiff or even acknowledge her. Plaintiff was completely ignored by Schieferecke and Bailey.

23.     By May 27, 2021, the environment was so hostile, tense, and stressful that Plaintiff vomited at work.

24.     The work environment continued to grow more hostile. By June 2021, Plaintiff had lost so much hair due to the stress and hostility that she had to shave her head.

25.     Plaintiff had several meetings with Rebeka Stanley in HR, during which Plaintiff reported the unbearably hostile work environment she was experiencing.

26.     On or about August 19, 2021, Stanley refused to file a written complaint on behalf of Plaintiff. Schieferecke offensively mocked and imitated Fred Sanford from Sanford and Sons in front of Plaintiff on several occasions.

27.     Schieferecke was also derogatory toward candidate for hire Saniya Zalekian and did not want to give her an interview because from her name he assumed she was African or of Middle Eastern descent because of her name.

28.     Schieferecke communicated respectfully with the white, Caucasian scientists. Plaintiff put a tremendous effort into communicating with Schieferecke to support a strong and friendly work environment.

29.     In 2021, Schieferecke updated other instruments with shorter methods on GC/MS instruments. When Plaintiff asked Schieferecke about putting a shorter method on her instrument, Hp-4, to shorten her instrument time and finish her work more quickly, Schieferecke responded that Plaintiff had to write a shorter method for Hp-4. Schieferecke did not put the shorter methods on Hp-4. Plaintiff learned that the shorter method had already been written and was being used on several other instruments. Complainant asked another scientist, Beth Royel, to help her add two shorter methods to Hp-4 and learn how to validate new methods. It was during this validation

process that Complainant learned that Turasky had already been trained to validate on Complainant's Hp-4 instrument, earlier in the year.

30.     On or about October 11, 2021, Schieferecke approached Plaintiff while she was setting up a sequence on Hp-4 instrument and told her that the Chinese Wuhan Lab was making a Negro Virus. He then repeated the statement a couple of times when Plaintiff remained   silent, "They are making a Negro Virus." Schieferecke continued to laugh and when a female colleague, Bianca Bailey, came in, he repeated, "They are making a Negro Virus."  Schieferecke said, "You know, the virus that will cause your arms and legs to rot."  They both laughed.

31.     Use of the word "Negro" violates the KBI's policies when it is used as Schieferecke used it.

32.     On November 10, 2021, Plaintiff reported this discriminatory and harassing conduct and use of the word "Negro" to her immediate supervisor Knox who had returned from maternity leave. Plaintiff also reported the sexually harassing DVD to Knox at this time. Knox admits that Plaintiff reported to her that Schieferecke created a hostile work environment for her.

33.     Knox admits that Plaintiff's complaint about Schieferecke using the slur "Negro" constituted a complaint of racial discrimination. Knox acknowledges that what Plaintiff reported concerning how Schieferecke used "Negro," if true, would constitute racial discrimination or harassment.

34.     Knox admits that Plaintiff made a complaint about sexual harassment when she complained about the DVD.

35.     Knox admitted that Knox never interviewed any of Schieferecke's colleagues about whether he had made any other racially derogatory statements. Knox never asked the forensic chemists to log or report any derogatory statements or behavior made by Schieferecke.

36.    On or about November 10, 2021, Plaintiff also reported to Human Resources that in December 2019, Jim Schieferecke ("Schieferecke") instructed a female employee, Bianca Bailey, to write and display the book title "Elvis Presley: The last 24 Hours" as Plaintiff's book for the holiday decorations to humiliate Plaintiff relating to the demeaning way Elvis died - naked and alone in his bathroom after four months of constipation. Plaintiff was so embarrassed she took the book title down.

37.    Schieferecke reports he received no discipline, no additional training, and not even any counseling for the discriminatory conduct reported by Ms. Broil.

38.    After Plaintiff's reports of discrimination on November 10, 2021, management and HR employees' treatment of her changed dramatically and became distinctly hostile. KBI Management and Human Resources began treating Plaintiff like their adversary. The KBI's severe and pervasive retaliatory harassment of Plaintiff created a hostile work environment that would dissuade a reasonable worker from engaging in protected activity.

39.    There is also no record of any other KBI laboratory employee other than Ms. Broil reporting race discrimination and sexual harassment.

40.    On December 10, 2021, KBI Associate Director David Hutchins noted that Mary Henderson believes the KBI may be in a "pre-litigation posture" with Ms. Broil, despite Ms. Broil doing nothing more than reporting discrimination and a hostile work environment internally.

41.    During a meeting on December 10, 2021, Henderson, Stanley, and Knox discussed recording their conversations with Ms. Broil moving forward.

42.    There is no record of any other KBI laboratory employee having his or her meetings with HR and Management recorded.

43.    The KBI did in fact record its conversations with Ms. Broil.

44.    Ms. Broil, the only employee who reported discrimination, is also the only employee whose meetings were recorded.

45.    The decision to record meetings with Ms. Broil and then deny Ms. Broil's request for a copy of the recording after the first recorded meeting constitutes retaliatory harassment that created a hostile work environment that would dissuade a reasonable worker from engaging in protected activity.

46.    Plaintiff was denied the opportunity to continue her training in the KBI Lab in November/December 2021.  Plaintiff was denied the opportunity to learn the LAM storage system. Plaintiff's colleagues who had not reported discrimination continued their training.

47.    In January 2022, the harassment continued as Plaintiff performance was criticized, attacked, and reviewed in retaliation for her complaints of discrimination in November 2021.

48.    Plaintiff was required to meet specific peer review quotas under different conditions than her colleagues for months, which interfered with her speed of reports being peer reviewed and finalized. This constitutes retaliatory harassment.

49.    In March 2022, the KBI reached out to employees to solicit complaints and reports of any issues or mistakes by Plaintiff.  The KBI did not reach out and solicit complaints and reports of any issues or mistakes by any other employee other than Plaintiff. The KBI did not even ask these questions concerning Schieferecke to determine if Schieferecke was behaving inappropriately at work.

50.    Beth Royel was instructed to document everything that she found related to Plaintiff, whether it was suggestions of how Broil could do something better or make mistakes during the peer review process. The issues Ms. Royel noted were typically clerical in nature and were the same clerical mistakes that the other forensic chemists sometimes make. Ms. Royel was

never asked to document these clerical mistakes for any other employee during her 14 -year career. In fact, Royel was never asked to document any mistakes or issues with any other employee during her career other than Plaintiff.

51.     Plaintiff was sent to Fred Pryor Training for the first and second quarter of 2022 instead of receiving the work-specific training her colleagues received. Specifically, Plaintiff was required to take the seminar, "Dealing with Difficult People" in April 2022.

52.     Conversely, Schieferecke was never required to attend Frey Pryor training despite his record of yelling at and disrespecting his female colleagues, including his female supervisor.

53.     Plaintiff's legitimate requests for training she had not received and to have a particular system task demonstrated in the KBI's LIMS and LAMS software and computer system were dismissed and Plaintiff accused of making excuses and not accepting responsibility.

54.     Knox refused to demonstrate for Plaintiff how to do specific tasks using the computer system correctly when Plaintiff requested demonstrations so she could learn.

55.     In fact, Knox's retaliatory harassment of Plaintiff continued and worsened. Knox avoided speaking with Plaintiff in person at all. She stopped greeting Plaintiff and stopped friendly interactions while continuing to treat Plaintiff's colleagues, including the sometimes-disrespectful Schieferecke, with warmth and friendliness.

56.     When Plaintiff made small clerical mistakes the first time, she had to do a specific task in the LIMS or LAMS systems that she had received little to no training as to how to use, Plaintiff was scolded and her requests to be shown how to do the clerical entry were rebuffed.

57.     Knox summoned all employees except for Plaintiff to attend continuing learning training and excluded Plaintiff from an educational opportunity but even more so isolated Plaintiff further from her co-workers. Plaintiff was prohibited from sending emails raising issues or making

complaints.

58.     KBI Laboratory Director TL Price condescendingly referred to Plaintiff as "young lady."

59.     Notably, Plaintiff completed an approved training program, passed all examinations and assessments, and received three work authorizations from April 29, 2019, through October 13, 2020.

60.     Plaintiff successfully analyzed unknown chemical substance from October 11, 2019, through July 28, 2022.  Plaintiff testified as an expert in criminal proceedings concerning the unknown substance analyses she conducted during that time period.

61.     On July 28, 2022, after working several years as a KBI Forensic Scientist III and earning the required work authorization much earlier in her employment, Plaintiff was suddenly placed on a retraining/remedial training program that Defendant expected to take at least seven months for Plaintiff to complete. These training sections required extensive review and memorization of training materials, organic chemistry, history, and other items that an experienced forensic chemist has not reviewed since she earned her degree. Plaintiff was required to pass the examinations for each retraining module at the 90% rate. Plaintiff was told that there was no record of her original training, but there was no dispute Plaintiff had completed her initial training program and received three work authorizations earlier in her employment.

62.     The KBI policy specifically states in section number six of the KBI Training Program, scientists with prior experience will have a personalized training program written for them that is approved by the supervisor and/or tech lead. It is **only** when the experienced scientist **fails** to complete that individualized-training program, that an experienced scientist is required to go back and start the training program from the beginning as if they were newly-graduated from

college, without experience.

63.     The KBI's records reflect and it explicitly stated in an email dates March 15, 2022, that Plaintiff successfully completed her initial personalized training program on October 13, 2020.

64.     No one who entered the KBI Chemistry Lab with prior work experience, other than Plaintiff, has been placed on a retraining/remedial training program to cover every section of training a brand-new forensic scientist without experience is required to complete.

65.     Remedial training programs are intended to be narrowly tailored to address only those issues that require remedial training.  For example, remedial training has involved merely reviewing a couple of KBI policies.

66.     Trainer Riddle himself demonstrated a significant performance issue and was disciplined because an audit revealed he was not marking evidence according to the policy. Riddle's issue was addressed through retraining only on the narrow topic of labelling evidence. Riddle's own remedial training complied with the policy and was narrowly tailored to address just the issue/mistakes he made in his actual work performance.

67.     Trainer Riddle admitted that he and Knox ***did not even consider*** a narrower remedial training program.

68.     Plaintiff's immediate supervisor Knox and trainer Riddle, who together created this remedial training program as well as the KBI's Corporate Representative who was designated to testify as to every reason Plaintiff was placed on a Remedial Training Program, could not point to a single issue or mistake Plaintiff made, a request from Plaintiff for that specific training, or even just a reasonable justification Plaintiff was being pulled from conducting the work taxpayers were paying her to conduct and instead go through the following Remedial Training Sections: 4) Spot Tests; 5) Cocaine; 6) Stimulants; 7) Hallucinogens; 8) Depressants; 9) Opiates; 10) Steroids; 11)

Designer Drugs; 12) Miscellaneous Training Topics. These sections alone that Defendant provides no justification for would have taken Plaintiff at minimum three full months even on their tight timeline and then an oral board covering the entire training program would have taken still another month that would largely have covered material that was entirely unrelated to a single issue, mistake, or weakness Plaintiff actually demonstrated in her work performance.

69.    Notably, during this massive remedial training program where Plaintiff was subjected to the full training and testing of a new employee right out of school, the KBI never revoked Plaintiff's work authorizations and continued to view her as qualified to testify as an expert about the analyses she conducted that they were requiring her to retrain upon. In fact, Plaintiff testified in two criminal prosecutions during her remedial training program.

70.    The KBI compelled an expert forensic chemist, who it continued to authorize, trust, endorse, and empower to provide testimony that would support felony convictions and possibly decades of imprisonment, to stop conducting the unknown substance analyses at which she excelled to instead suffer through at least seven months on a remedial training program financed by tax payers that largely had absolutely no justification and clearly violated KBI policies.

71.    The only difference between Plaintiff and every other KBI forensic chemist, all of whom were NEVER placed on a remedial training program anywhere close to the size and scale of Plaintiff, is that Plaintiff reported illegal discrimination and the rest of her colleagues did not.

72.    In the beginning of Plaintiff's retraining program on LIMS applications and reports, which was training that Plaintiff had been requesting for more than a year, Plaintiff was not even provided all necessary materials upon which she was examined on the first test.  More than half of the content tested upon was not in any of the materials Plaintiff received. This is the only section examination Plaintiff did not pass, but her failure was excused and did not result in her termination

since she was not provided with the appropriate materials to pass.

73.     The Lab Director and the Retraining Team insisted they had to write the Retraining Program only because there was no record of Plaintiff's original training program. However, they indicated there had been no specific problem with Plaintiff's job performance and further, they declined to view the records Plaintiff had kept of her initial training and which she offered to provide.

74.     Riddle admits there was no policy, practice, or procedure that required Plaintiff to have undergone the same training a new forensic chemist received or any training that was not included in her individualized initial new employee training program.

75.     The training program schedule was unfair and designed so Plaintiff would fail to complete it within the allotted target completion dates , particularly when combined with the other restrictions, interference, and obstacles put in place by Riddle and Knox for the terrified, anxious, and sleep-deprived Ms. Broil to attempt to pass on the first attempt at 90% or higher under the immense pressure of a failed examination resulting in her termination.

76.     For every other forensic chemist, target completion dates are mere flexible goals without consequence if an employee takes more time than the target date to complete or does not obtain a 90% or higher score on each section examination.

77.     The remedial training program, designed by Knox and Riddle, provided no time to address correspondence and other administrative tasks Plaintiff had as a scientist who had been previously working fulltime, such as responding to subpoenas for court testimony on completed laboratory analysis or participating in office meetings. When Plaintiff was subpoenaed and prepared for and attended court to testify, no adjustments were made to her retraining schedule. The retraining program provided for no time missed from work for vacation time, sick time, or

inclement weather.

78.    Only at Plaintiff's persistent request did Knox email information and provide a textbook she used during her training to answer questions in the retraining module since materials were not provided to Plaintiff that covered all of the topics being tested. Plaintiff submitted the completed assignment to Riddle, but he would not accept the work after being copied on the email. Plaintiff was required to re-do the assignment, which required more time, putting Plaintiff further behind schedule. Additionally, some days the trainer left work early and worked from home delaying Plaintiff's progress as she had to wait until the trainer returned to work so she could get her questions answered and continue with training.

79.    It is every forensic scientist's responsibility to answer questions posed by those forensic scientists in training.

80.    Beth Royel was instructed not to answer any of Plaintiff's questions during her remedial training.

81.    Beth Royel testified that at no other time during her career was she ever instructed to violate the KBI's training practice and refuse to answer questions from an employee being trained.

82.    Plaintiff was denigrated when she asked questions concerning areas not directly covered by the training materials and Trainer Riddle sometimes refused to answer Plaintiff's questions. Trainer Riddle scorned Plaintiff's requests for information such as Plaintiff's request for the formula the KBI, an accredited law enforcement laboratory, wanted her to use for a specific computation that was not included in the training materials. Riddle testified that these were inappropriate requests by Plaintiff that he refused to entertain because she was expecting him to "spoon-feed" her the material. Instead, Plaintiff wasted additional time searching for the formulas

and answers, and at one point Riddle disparaged Plaintiff for her failure to go to a random message board on the internet that was not affiliated with any accredited, governmental, or educational institution to use as a source to locate the information needed. As a college professor, Plaintiff never even considered using an unreliable source, which would be unacceptable to site in a freshman research paper, to uncover critical information the KBI intended her to know to pass training.

83.     Plaintiff was required to provide a detailed plan before she was allowed to work from home, even though her colleagues were not required to do this.

84.     Plaintiff was required to submit a daily account of what had been done and also have a daily meeting with her supervisor and trainer. There were meetings with the supervisor and trainer together, meetings with the supervisor alone, and meetings with the trainer alone each day. These meetings took time from Plaintiff's training.

85.     Because Defendant placed Plaintiff on her retraining/remedial training program, she was not able to attend the SWAF conference because she would risk termination as it would delay her training., while her colleagues who had not reported discrimination were allowed to attend the conference.

86.     It is KBI's practice that laboratory employees are encouraged to seek out training outside the KBI every year.

87.     In August 2022, Plaintiff was denied the opportunity to seek the crime scene investigating position despite her years of experience investigating crime scenes.

88.     The retaliatory harassment described above, which Plaintiff experienced after reporting discrimination in November 2021, would dissuade a reasonable worker from engaging in protected activity.

89.     On December 5, 2022, the retaliation culminated in Plaintiff's termination after another unfair and inaccurate performance review stated Plaintiff did not complete the retraining program in a timely manner.

90.     Plaintiff's termination was retaliation for opposing discrimination.

91.     As a direct result of Defendant's unlawful actions, Plaintiff has suffered pecuniary and non-pecuniary losses including but are not necessarily limited to past wages and benefits, pain and suffering, emotional distress, hair loss, sleep deprivation and interruption, trauma, mental suffering, mental anguish, anxiety, trauma, humiliation, and inconvenience. Plaintiff is entitled to an award of monetary damages and equitable relief.

## COUNT I – SEX DISCRIMINATION
## IN VIOLATION OF TITLE VII

For her claims under Count I against Defendant State of Kansas, Kansas Bureau of Investigation, Plaintiff states the following:

92.     Plaintiff incorporates by reference the allegations of Paragraphs 1 through 91 as though fully set forth herein.

93.     Plaintiff is a female and thus a member of that protected class.

94.     Plaintiff was qualified for the position of Forensic Scientist III.

95.     Plaintiff was treated less favorably than her male colleagues as set forth in greater detail in the Factual Background of the Complaint and in Paragraphs 96A-96B below.

96.     Because of her sex, Plaintiff suffered adverse employment actions and a hostile work environment, which included but is not limited to the following:

A.     She was sent to Fred Pryor training to allegedly obtain "soft skills" to better communicate in the workplace because of her complaints of hostility, while the male employee who harassed her was not sent to any training, despite his history

of yelling at and disrespecting several female forensic scientists, including his female manager;

B.    HR refused to file complaints on her behalf when she complained in violation of their policy;

97.    All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees acting within the course and scope of their employment or agency, as set forth herein, and amount to violations of Title VII.

98.    As a direct result of Defendant's unlawful actions, Plaintiff has suffered pecuniary and non-pecuniary losses including but are not necessarily limited to past wages and benefits, pain and suffering, emotional distress, mental suffering, mental anguish, anxiety, trauma, humiliation, and inconvenience. Plaintiff is entitled to an award of monetary damages and equitable relief.

99.    Plaintiff is entitled to recover all of her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

WHEREFORE, Plaintiff prays for judgment against Defendant for actual damages, all costs, expenses, expert witness fees and attorney's fees incurred herein and appropriate equitable relief, for interest at the highest lawful rate and for such other relief as the Court deems just and proper.

## COUNT II – RETALIATION IN VIOLATION OF TITLE VII

For her claims under Count II against Defendant State of Kansas, Kansas Bureau of Investigation, Plaintiff states the following:

100.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 99 as though fully set forth herein.

101.    Plaintiff engaged in protected opposition to sex, race, color, and nationality and opposition to retaliation because of those complaints, which she made through internal complaints as well has her Charges of Discrimination referenced herein. A reasonable employee would have found the actions and treatment to be materially adverse.

102.    Plaintiff was treated less favorably than similarly situated colleagues who had not reported discrimination and retaliation as set forth in greater detail in the Factual Background of the Complaint and in Paragraphs 103A-103G below.

103.    As a result of and after Plaintiff's protected opposition to discrimination and retaliation, Plaintiff suffered adverse employment actions, which included but were not limited to the following:

A.    She was prohibited from applying for the open crime scene investigation position despite many years of experience investigating crime scenes while her similarly situated colleagues, who had not opposed discrimination and retaliation, were permitted to apply;

B.    She was sent to Fred Pryor training to allegedly obtain "soft skills" to better communicate in the workplace because of her complaints of hostility, while the white, male who harassed her and not opposed discrimination and retaliation was not sent to any training;

C.    She was required to meet peer review quotas under different conditions than her similarly situated colleagues, who had not opposed discrimination and retaliation, including being limited to being peer reviewed by three chemists each with different requirements;

D.     Her performance was unfairly evaluated and less favorably evaluated than similarly situated colleagues, who had not opposed discrimination and retaliation;

E.     She was placed on a retraining program, which included entire sections of retraining that no one at the KBI can point to a single deficiency Plaintiff had in performing analyses in those subject, and this was done in violation of policy, while her similarly situated colleagues, who had not opposed discrimination and retaliation, were not placed on a similar retraining program;

F.     She was placed on a special evaluation or performance improvement plan, while her similarly situated colleagues, who had not opposed discrimination and retaliation, were not placed on a similar special evaluation;

G.     Her employment was wrongfully terminated in retaliation for her complaints of discrimination and retaliation.

104.   All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees acting within the course and scope of their employment or agency, as set forth herein, and amount to violations of Title VII.

105.   Plaintiff is entitled to recover all of her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

WHEREFORE, Plaintiff prays for judgment against Defendant for actual damages, all costs, expenses, expert witness fees and attorney's fees incurred herein and appropriate equitable relief, for interest at the highest lawful rate and for such other relief as the Court deems just and proper.

## COUNT III – RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

For her claims under Count III against Defendant State of Kansas, Kansas Bureau of Investigation, Plaintiff states the following:

106. Plaintiff incorporates by reference the allegations of Paragraphs 1 through 105 as though fully set forth herein.

107. Plaintiff engaged in protected opposition to sex, race, color, and nationality and opposition to retaliation because of those complaints, which she made through internal complaints as well has her Charges of Discrimination referenced herein. A reasonable employee would have found the actions and treatment to be materially adverse.

108. Plaintiff was treated less favorably than similarly situated colleagues who had not reported discrimination and retaliation as set forth in greater detail in the Factual Background of the Complaint and in Paragraphs 111A-111V below.

109. While Plaintiff was an employee of and/or subject to the direction and control of Defendant and based upon Plaintiff's opposition to and complaints of discrimination and retaliation, Defendant subjected Plaintiff to a hostile and offensive work environment on a continuous basis and which constituted a continuing pattern of unwelcome harassment, which could have dissuaded a reasonable worker from engaging in protected activity.

110. Plaintiff was subjected to a hostile work environment based upon her opposition of protected activity which involved denigration, yelling, hostility, disrespectful comments, exclusion from group, different application of policies, different daily requirements, imposition of different standards, and treatment as though she was unintelligent and undeserving of being treated with the respect provided to her colleagues who had not opposed discrimination.

111.    As a result of and after Plaintiff's protected opposition to discrimination and retaliation, Plaintiff suffered a severe and pervasive retaliatory hostile work environment, which included but is not limited to the following:

A.    She experienced significant hostility from managers and human resources, who labeled their position to her as adverse and "pre-litigation posture" just weeks after Plaintiff's internal complaints despite her not taking any action outside of internal reports permitted by the KBI's policies;

B.    She experienced significant hostility from her harasser who was so angry about Plaintiff's complaints about him that he called her "ni*ger" and "black bitch" to another colleague at work;

C.    Management and human resources were so hostile to her complaints of discrimination that they refused to provide her with a complaint form or accept a written complaint of retaliation for months;

D.    She was excluded and isolated from her team;

E.    Her review was recorded but she was refused a copy of the recording, while the reviews of her similarly situated colleagues, who had not opposed discrimination and retaliation, were not recorded;

F.    Her meetings with management were recorded, while the meetings of similarly situated colleagues, who had not opposed discrimination and retaliation, were not recorded;

G.    KBI Laboratory Director T.L. Price was so hostile toward Plaintiff that he referred to Plaintiff as "young lady."

H.      She was denied the opportunity to attend conferences, while her similarly situated colleagues, who had not opposed discrimination and retaliation, were permitted to attend;

I.      She was prohibited from applying for the crime scene investigating position despite many years of experience investigating crime scenes while her similarly situated colleagues, who had not opposed discrimination and retaliation, were permitted to apply;

J.      She was sent to Fred Pryor training to allegedly obtain "soft skills" to better communicate in the workplace because of her complaints of hostility, while the white, male who harassed her and had not opposed discrimination and retaliation was not sent to any training;

K.      She was required to meet her peer review quotas under different conditions than her similarly situated colleagues, who had not opposed discrimination and retaliation, including being limited to being peer reviewed by three chemists each with different requirements;

L.      Her equipment was not updated with the shorter methods uploaded to the equipment of her similarly situated colleagues, who had not opposed discrimination and retaliation, which limited her ability to complete her tasks more quickly and with greater efficiency;

M.      She was prohibited from working from home without a detailed plan, but her similarly situated colleagues, who had not opposed discrimination and retaliation, were allowed to work from home without providing any plan;

N.     Beginning in August 2022, Plaintiff was required to submit a daily account of everything she had done and subjected to daily meetings with her supervisor, but her similarly situated colleagues, who had not opposed discrimination and retaliation, were not required to submit these daily accounts when working from home or have daily meetings during their training;

O.     Her performance was unfairly evaluated and less favorably evaluated than similarly situated colleagues, who had not opposed discrimination and retaliation.

P.     HR refused to file complaints on her behalf when she complained in violation of their policy;

Q.     She was placed on a special evaluation or performance improvement plan, while her similarly situated colleagues, who had not opposed discrimination and retaliation, were not placed on a similar special evaluation;

R.     She was placed on a retraining program, which included entire sections of retraining that no one at the KBI can point to a single deficiency Plaintiff had in performing analyses in those subject, and this was done in violation of policy, while her similarly situated colleagues, who had not opposed discrimination and retaliation, were not placed on a similar retraining program;

S.     During Plaintiff's retraining she was not provided the support, resources, assistance, and materials provided to her similarly situated colleagues, who had not opposed discrimination and retaliation, during training;

T.     Plaintiff was prohibited from asking colleagues questions during training, other than her manager Knox and trainer Riddle, which was contrary to the laboratory's practice that all forensic scientists assist with training and answer any

questions asked, this exposed Plaintiff to severe and pervasive hostility throughout her retraining/remedial training period;

U.     Plaintiff's trainer Chris Riddle was so hostile to her that he considered her asking for the mathematical formula the KBI wanted her to use in a specific scenario, which was not included in any of the training materials provided, amounting to Plaintiff demanding to be spoon-fed her training material; and

V.     Her retraining schedule/calendar was unfair and did not consider administrative task requirements, new daily meetings, daily lists of tasks, holiday time, vacation time, sick time, inclement weather, time preparing to testify, time spent testifying in court, trainer unavailability, or the extensive stress and distress Plaintiff was experiencing on account of her ongoing hostile work environment.

112.     This retaliatory hostile work environment was severe and pervasive and absolutely would dissuade a reasonable worker from engaging in protected activity.

113.     Defendant knew or should have known about the hostile and offensive work environment and failed to take prompt remedial or corrective action to end such harassment as described in the background facts.

114.     All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees acting within the course and scope of their employment or agency, as set forth herein, and amount to violations of Title VII.

115.     The retaliatory harassment was so significant that Plaintiff vomited at work and lost so much hair she had to shave her head.

116.     As a direct result of Defendant's unlawful retaliatory actions, Plaintiff has suffered pecuniary and non-pecuniary losses including but are not necessarily limited to past wages and

benefits, pain and suffering, emotional distress, mental suffering, mental anguish, anxiety, trauma, humiliation, and inconvenience. Plaintiff is entitled to an award of monetary damages and equitable relief.

117.    Plaintiff is entitled to recover all of her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

WHEREFORE, Plaintiff prays for judgment against Defendant for actual damages, all costs, expenses, expert witness fees and attorney's fees incurred herein and appropriate equitable relief, for interest at the highest lawful rate and for such other relief as the Court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Deborah (DC) C. Broil respectfully demands a trial by jury on all the allegations contained in this Complaint that are triable before a jury.

Respectfully submitted,

***Baldwin & Vernon Trial Attorneys, LLC***

By      */s/Erin N. Vernon*
            Erin N. Vernon, KS Bar No. 25792
            Kevin Baldwin, KS Bar No. 18637
            EmmaLee Wilson, KS Bar No. 78592
            108 S. Pleasant St.
            Independence, MO  64050
            Ph: (816) 842-1102
            Fax: (816) 842-1104
            Email: Erin@BVTrialAttys.com
                        Kevin@BVTrialAttys.com
                        Emma@BVTrialAttys.com

            ATTORNEYS FOR PLAINTIFF