**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **DEBORAH (DC) C. BROIL,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**STATE OF KANSAS, KANSAS BUREAU OF INVESTIGATION AND ITS REPRESENTATIVES,**<br><br>**Defendant.** | **Case No. 24-CV-2029-DDC-RES** |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Kansas Bureau of Investigation (KBI) ("Defendant"), respectfully requests the Court grant summary judgment in favor of the Defendants for all of Plaintiff's claims under Fed. R. Civ. P. 56. Defendant states the following in support.

## NATURE OF THE CASE

Plaintiff, a former employee of the KBI, alleges that the termination of her employment with the KBI on December 5, 2022, along with other various incidents during her employment, constitute sex discrimination or retaliation for internal complaints and complaints to the Equal Employment Opportunity Commission (EEOC) and the Kansas Human Rights Commission (KHRC). (ECF 113 at 5-9, 16-17.) Plaintiff filed this lawsuit on January 22, 2024 (ECF 1), and filed an Amended Complaint ("Complaint") on June 18, 2024 (ECF 22). The Court entered a Pretrial Order on June 25, 2026 (ECF 113 at 16-17). Plaintiff brings claims under Title VII of the Civil Rights Act of 1964. (ECF 113 at 16-17.)

On March 26, 2025, the Court dismissed Plaintiff's earlier hostile-work-environment claims under Title VII. (ECF 37 at 28). On May 8, 2026, the Court denied Plaintiff's motion to reconsider or to amend to reintroduce those claims. (ECF 108 at 1). In the Pretrial Order, Plaintiff abandoned her claims for race discrimination under Title VII and for age discrimination under the Kansas Age Discrimination in Employment Act. (ECF 113 at 17).

The Court should dismiss Count II ("Sex discrimination in violation of Title VII") due to Plaintiff not being qualified, Defendant having legitimate, non-discriminatory reasons for the alleged adverse actions, and Plaintiff lacking admissible evidence to support any inference of discrimination or pretext. The Court should dismiss Count III ("Retaliation in violation of Title VII") due to some alleged events not involving protected activity, some alleged events not constituting adverse actions, lack of temporal proximity, Defendant having legitimate, non-discriminatory reasons for the alleged adverse actions, and Plaintiff lacking admissible evidence of any pretext.

**Statement of Uncontroverted Facts**

1. Plaintiff accepted an offer of employment to work as a Forensic Scientist III with the KBI with a start date of April 29, 2019. (Ex. D at 6; Ex. 17; ECF 113 at 2).

2. Plaintiff is female, and the hiring officials at the KBI, including T.L. Price, were aware of Plaintiff's sex when she was hired. (ECF 113 at 2-3; Ex. B at #8; Ex. D at #4-5; Ex. 15-16; Ex. 81 at #4, 9).

3. Laboratory Director T.L. Price recommended that the KBI hire Plaintiff. (Ex. 79 at 109:18-20, 110:17-111:2).

4. When Plaintiff worked at the KBI, the majority of forensic scientists in the Chemistry section were female, and the majority of forensic scientists at the KBI in general were also

female. (ECF 113 at 3; Ex. 81 at #1-2).

5. Plaintiff was employed by Defendant's Kansas Bureau of Investigation Forensics Science Laboratory in Topeka as a Forensic Scientist III, from April 29, 2019, to December 5, 2022. (ECF 113 at 2; Ex. D at #7-8; Ex. 18-19).

6. When Plaintiff worked at the KBI as a Forensic Scientist from 2019 to 2022, the KBI's chemistry laboratory was accredited in the field of Forensic Testing by ANAB as fulfilling the requirements of ISO/IEC 17025 International Standard and the requirements of ANAB Accreditation Requirements For Forensic Testing and Calibration. (ECF 113 at 3).

7. Prior to working at the KBI, Plaintiff had not worked in any forensics laboratory accredited in the field of Forensic Testing by ANAB as fulfilling the requirements of ISO/IEC 17025 International Standard or the requirements of ANAB Accreditation Requirements For Forensic Testing and Calibration. (ECF 113 at 3; Ex. 81 at #15-18, 20).

8. Plaintiff was placed on a modified training program when she started working at the KBI. (Ex. 15, 60, 74; *see also* ECF 113 at ex. stip. iv).

9. This training program was established based upon the recommendations of her initial supervisor Dwain Worley. (Ex. C at #7; Ex. 15, 59, 60, 74).

10. Christa Knox took over from Dwain Worley as Plaintiff's interim supervisor in early 2020 and (no longer interim) supervisor in February 2021. (Ex. C at #1, 6).

11. Plaintiff failed to complete the initial training within the established timelines and completed the final portion of the training on October 13, 2020, a year after the initial deadline. (Ex. C at #8; Ex. 60).

12. Due to the COVID pandemic, Plaintiff was on administrative leave starting March 23, 2020, but was back to work at the KBI starting May 11, 2020. From June 2020 through April

2021, Plaintiff worked every other week in the laboratory and the other weeks she worked remotely until April 2021, when she returned to the laboratory full time. (Ex. 82 at #22).

13. Mary Henderson, Assistant Laboratory Director, is a black female. (Ex. B at #1; Ex. 81 at #3).

14. Henderson decided to limit Plaintiff's case report reviews during her initial training to Chris Riddle and Beth Royel because Plaintiff was having difficulty properly documenting and reporting work. (Ex. B at #9-10; Ex. 38).

15. Early reviews on her work performance by Chemistry Technical Leader Chris Riddle ("Riddle") indicate she was a good forensic chemist, but that compared to most KBI chemists, she was very slow with every aspect of the analysis process. (Ex. A at # 1-2, 16; Ex. 3).

16. Riddle believed this could improve over time because she had previously developed her forensic habits as a lone chemist. (Ex. A at #16; Ex. 3).

17. Riddle believed she would benefit from more one-on-one training and a lot of explanation about why and when things are done in the KBI lab. (Ex. A at #16; Ex. 3).

18. Riddle sent an email in March of 2020 indicating he was comfortable with releasing Plaintiff to do case work. The normal case review process for all forensic chemists would still apply. (Ex. A at #17; Ex. 4)

19. Employees in the Chemist section at the forensic laboratory receive annual performance reviews. (Ex. D at #24-26; Ex. 35 at OAG008118-19; Ex. 36 at OAG008168).

20. Knox prepared Plaintiff's reviews after she took over as interim supervisor in 2020, including the evaluation at the end of the review period for that year. (Ex. C at #9, 11).

21. Plaintiff's performance review for the period between November 15, 2019, and November 24, 2020 ("2020 Review") included a needs improvement rating for her monthly case

production and monthly case files reviewed. (Ex. C at #10; Ex. D at #14; Ex. 26; *see also* ECF 113 at ex. stip. iii).

22. The 2020 Review took into account the impact of stay-at-home orders prompted by COVID-19. (Ex. C at #12; Ex. 26).

23. The 2020 Review references that Broil completed her training only after multiple extensions. Plaintiff was advised to work with her trainer to set appropriate deadlines. (Ex. C at #13; Ex. 26).

24. The 2020 Review also identified a quality issue because her case reviews were shaky during the beginning of the review period, with reviewers identifying many corrections that needed to be made. (Ex. C at #14; Ex. 26).

25. Plaintiff was directed in her 2020 Review to continue to improve her documentation and report writing. (Ex. C at #15; Ex. 26).

26. Plaintiff received a midyear performance review on May 20, 2021. (Ex. C at #16; Ex. D at #15; Ex. 27; *see also* ECF 113 at ex. stip. iii).

27. This review identified Plaintiff monthly case production number still fell below the monthly averages. (Ex. C at #16; Ex. 27).

28. The review also identified that Plaintiff struggled with the peer review process and this resulted in inconsistencies in her report and notes wording. (Ex. C at #17; Ex. 27).

29. To address this issue, Plaintiff was assigned to only two peer reviewers. Limiting her reviewers was intended to help Broil by streamlining the process and not as a punishment. (Ex. C at #17; Ex. B at #25-26; Ex. 27).

30. Plaintiff received a performance review for the period between November 24, 2020, and December 21, 2021 ("2021 Review"). (Ex. C at #19; Ex. D at #16; Ex. 28; *see also* ECF 113 at

ex. stip. iii).

31. There were a number of deficiencies in her work performance as reflected in this review. Plaintiff received a needs improvement for her monthly case production, performance of tasks assigned, attitude/accountability, and communication. (Ex. C at #19; Ex. 28).

32. Plaintiff had increased case production, but still fell short of expectations. (Ex. C at #20; Ex. 28).

33. Plaintiff failed to timely complete tasks she was assigned via email, specifically missing a FMLA training deadline by months and delaying tasks completion until the day of, which required her to work additional hour outside of her normal work week to complete them. (Ex. C at #21; Ex. 28).

34. Plaintiff failed to accurately report time on her timesheet on multiple occasions. When additional information was requested by her supervisor to address the timesheet errors, Plaintiff was defensive. (Ex. C at #22; Ex. 28).

35. Plaintiff struggled to communicate clearly with her supervisors via email, which required follow up emails. (Ex. C at #23; Ex. 28).

36. Plaintiff also worked overtime from home without prior authorization. (Ex. C at #23; Ex. 28).

37. Plaintiff knew that the 2021 Review was a negative review, and on January 19, 2022, she sought a follow-up meeting to discuss the review further. (Ex. C at #24; Ex. B at #30; Ex. 48).

38. Plaintiff was asked by Mary Henderson to submit questions she had so they could be addressed both through conversation and in writing. (Ex. 48).

39. Plaintiff submitted fifteen questions, in a document three pages long, to be addressed at a meeting regarding her 2021 review, saying "I have attached my review of the Performance

Review." (Ex. C at #25; Ex. B at #30; Ex. 49).

40. A meeting was scheduled for January 24, 2022, to discuss Plaintiff most recent performance review and her follow up questions. (Ex. C at #26; Ex. 48).

41. At 8:21 a.m., January 24, 2022, responses to Plaintiff's questions were provided by Knox, with assistance in drafting from Henderson, adding on to Plaintiff's document to make it about ten and a quarter pages long. (Ex. C at #26; Ex. B at #30; Ex. 48, 50).

42. Later that day, Plaintiff provided additional responses prior to the meeting, bringing the document to twelve pages. (Ex. C at #26; Ex. B at #30; Ex. 48, 51).

43. The meeting held on January 24, 2022, was attended by Mary Henderson, Christa Knox, and Plaintiff. It was recorded and Henderson informed Broil it was being recorded. (Ex. C at #27; Ex. 48; Ex. 77 at 66:6-9; *see also* Ex. 77 at 46:23-47:9; Ex. B at #29; Ex. 47).

44. Plaintiff's questions showed a lack of understanding of commonly used work phrases and abbreviations, such as a non-conformity or monthly case reviews. (Ex. C at #28; Ex. 50, 56).

45. A non-conformity is defined in policies and procedures of the laboratory, specifically policy QM-08. Specific to the 2021 Review, monthly case file reviews are a small sample of case files reviewed each month by the tech lead or designee as address in QM-10 Section 6. (Ex. C at #28; Ex. 50, 56).

46. Plaintiff was also provided feedback that she has struggled with consistency in her reports and note writing. (Ex. C at #28; Ex. 50 at #3-4).

47. Plaintiff's case production and review numbers were low, comparable to an entry-level scientist (Forensic Scientist I) while they complete the full initial training and extremely low for an experienced chemist. (Ex. C at #28; Ex. 50 at #3-4).

48. The response further elaborated on Plaintiff's failure to meet deadlines for tasked

assigned to her. This included failing to complete FMLA due on May 31, 2021, until October 8, 2021. This also included failing to submit professional goals as well as confidentiality and facility access forms until the due date and doing so by working unauthorized overtime. (Ex. C at #30; Ex. 50 at #5).

49. Clarification was provided on specific instances involving Plaintiff's timesheet where issues needing correction occurred on November 12, 2021, November 22, 2021, November 24, 2021, and December 10, 2021. (Ex. C at #31; Ex. 50 at #6).

50. Clarification was provided on specific instances in which Broil was either defensive or not forthcoming with information. In emails with a technical leader in February 2021 about a non-conforming report Broil was defensive in her response. Broil was not forthcoming with information in her response to an email sent by Knox on March 26, 2021 about the use of chemical element abbreviations. Plaintiff refused to provide sufficient details until after they were requested again in a follow-up email. The response to #7 also discussed Plaintiff's defensiveness while discussing the discrepancies with Plaintiff's time sheet. Additionally, Plaintiff was not forthcoming with all the information in incidents that occurred with Jim Schieferecke. (Ex. C at #32; Ex. 50 at #7).

51. Clarification was provided to Plaintiff regarding Fred Pryor training. Fred Pryor classes are seminars that cover a wide range of topics and Plaintiff was assigned them to provide her with additional tools to help her improve her time management and soft skills. (Ex. C at #33; Ex. 50 at #14; *see also* Ex. 82 at #4).

52. On January 13, 2022, Knox reported to Henderson a phone log issue. A case officer wanted an item resubmitted for testing. Plaintiff had previously been in contact with the case officer about this but had not created a phone log in LIMS for that communication as is required

by policy and training. The officer arrived to drop off the item but without the phone log, Evidence Control did not have permission to accept it. (Ex. C at #34; Ex. 61).

53. Knox conversed with Plaintiff about this incident and Plaintiff indicated that she did not know what else she needed to do after speaking to the officer. Knox told her to create a phone log. Plaintiff instead edited Knox's phone log in the case file in LIMS, that then had to be recovered. (Ex. C at #35; Ex. 61).

54. Knox then created a procedure document specifically for Plaintiff and gave her in-person training on how to properly create phone logs. Knox gave her a copy of the procedure document during the training and provided a digital copy via email. (Ex. C at #35; Ex. 61).

55. Knox had concerns that after two years of Plaintiff working at the KBI and Plaintiff having been previously trained regarding this important policy, Plaintiff was not keeping proper case records regarding conversations with contributors. (Ex. C at #36; Ex. 61).

56. In March of 2022, it was discovered that Plaintiff was using the same column on two separate instruments for gas chromatography-mass spectrometry (GCMS) analysis which is a violation of policy. (Ex. C at #37; Ex. 62).

57. Knox reported this information to Price and indicated Plaintiff had previously completed QT Chemistry SOP Refresher training that specifies you cannot use the same column type on both instrument runs. (Ex. C at #37; Ex. 62).

58. Plaintiff's failure to follow policy on the use of the same column resulted in an amended report and was included as a quality issue on Plaintiff's 2022 Mid-year review. (Ex. C at #38; Ex. D at #17; Ex. 29).

59. Plaintiff also had 3 additional amended reports listed as quality issues on the 2022 Mid-year review. (Ex. C at #39; Ex. 29).

60. One of these amended reports involved two issues, Plaintiff not verifying the correct laboratory address was included in the report footer and lack of clarity regarding what was analyzed. Another of these amended reports involved a typo in an item description by Plaintiff. The other of these amended reports involved a net weight being incorrect on a case where Plaintiff was the reviewer. (Ex. C at #40).

61. Plaintiff also had a non-conformity where Plaintiff was logging the prep for the TLC system on a sticky note instead of in the appropriate log sheet. (Ex. C at #41; Ex. 29, 63; Ex. 76 at 24-25.)

62. Plaintiff was not the only individual with the nonconformity and a retraining assignment was sent to Chemistry to review the policies for reagents and reagent refreshers. (Ex. C at #41; Ex. 29, 63).

63. Plaintiff failed to complete the assigned retraining by the deadline of April 1, 2022. Plaintiff's failure delayed the completion of the KBI's nonconformity resolution. Plaintiff was assigned a new deadline of April 4, 2022, at 5:00 p.m. (Ex. C at #42; Ex. 64).

64. On March 11, 2022, Chris Riddle found a report from Plaintiff with the wrong analysis address in the footer. (Ex. A at #18, 20; Ex. 5).

65. Riddle directed Plaintiff to prepare an amended report. (Ex. A at #20; Ex. 5).

66. An amended report is required when a case report has been released but has errors that rise to the level of requiring it be corrected and the re-released. (Ex. A at #18-19).

67. On April 20, 2022, Knox informed Plaintiff that she did not follow the instructions provided in February 2022 in preparing her amended reports. (Ex. C at #43; Ex. 65).

68. Mary Henderson escalated the performance issues involving Plaintiff to Director Price. (Ex. B at #33; Ex. 77 at 44:14-45:5).

69. Christa Knox prepared an analysis of DC's training files for Price to review. (Ex. C at #44; Ex. 59).

70. Riddle received an email from Alyssa Weeks, another KBI forensic chemist, regarding Broil's work product. Weeks indicated that she noticed issues that she felt Broil should have known better about by now. Weeks also indicated that reviewing Broil's reports "seemed to take more time and usually did seem to have some issues." (Ex. A at #21; Ex. 6).

71. Riddle frequently observed that Plaintiff would blame lack of training when she made mistakes or had issues with misunderstanding anything with regard to her work in the laboratory. She rarely, if ever, would admit fault. (Ex. A at #7).

72. Based upon review of the previous training and the issues with Plaintiff that had been raised, Price raised concerns (which Knox agreed with) that perhaps Plaintiff was not at the level the KBI thought she was when she was hired to her position as a Forensic Scientist III. (Ex. C at #44; Ex. 59).

73. On May 23, 2022, Plaintiff sent an email to Christa Knox saying, "I wish you been this attentive initially. . . Please don't assume I know the techniques if you have not shown me how to find the answers to your questions. . . Please don't assume I know how to search out information, I see with each of your request that my exposure to our systems was neglected. I had no idea this information was searched as Beth informed me. No one shared this kind of information with me. What are the basics you expect? Please don't keep telling what I didn't do something before you know if I have been trained/exposed to your request. Please inform me or refer me to someone who can show me what you need, I want so badly to comply." (Ex. C at #45; Ex. 66).

74. Knox construed this as feedback from Plaintiff that she was not initially trained in what

she needed to know to perform her job and she needed training. (Ex. C at #46; Ex. 66).

75. Plaintiff sometimes would say she was not trained in things her supervisors believed she had in fact been trained in. (Ex. 77 at 47:18-48:8).

76. Plaintiff also requested training regarding LIMS, LAMS, LCUVMS Quantitation, and determining EtOH percentages. (Ex. 81 at #43; *see also* Ex. 60).

77. On July 28, 2022, a meeting was held with Plaintiff, T.L. Price, Christa Knox, Chris Riddle, and Julie Kampsen to discuss Plaintiff's 2022 Mid-year Review. (Ex. C at #3, 47; Ex. 57 at 1, 46).

78. Plaintiff was informed that the meeting would be recorded and it was recorded. (Ex. 57 at 2:7-24; *see also* Ex. 77 at 46:23-47:9; Ex. 79 at 55:15-21, 100:5-23).

79. At the meeting Plaintiff was informed by Director Price that based upon conversation with Plaintiff and a review of her previous training, she was going to be placed on a training plan on information that was skipped in her initial training plan to fill in missing information, as well as some new training in some areas. (Ex. 57 at 16:13-17:2, 18:7-19:25, 20:14-21; *see also* Ex. 79 at 54:23-55:10, 66:2-12).

80. Riddle designed the retraining program for Plaintiff using his discretion as the Chemistry section Technical Lead. (Ex. A at #6, 11; Ex. 77 at 87:25-88:19).

81. Riddle would serve as Plaintiff's trainer during the remedial training. (Ex. A at #5; Ex. 11; Ex. 81 at #52; *see also* ECF 113 at ex. stip. iv).

82. Remedial training is covered in Forensic Science Laboratory Quality Manual QM-12 which covers personnel training. Remedial training is covered in § 9. Plaintiff's remedial training was developed and implemented in compliance with QM-12, including § 9. QM-12 § 6 covers the initial training of individuals with previous experience. (Ex. B at #35-39; Ex. 55; *see also*

ECF 113 at ex. stip. i).

83. A training plan was presented to Plaintiff, reviewed by the participants at the meeting, and initialed by Plaintiff on July 28, 2022. (Ex. A at #33; Ex. 11).

84. The training plan provided for a sixteen-phase training that was to take place between August 1, 2022 and February 13, 2023, and included proposed completion dates for the different sections. (Ex. A at #34; Ex. 11; Ex. C at #48).

85. The first two trainings were LIMS and Qualtrax training, training that was recently created and had not been included in Plaintiff's initial training. (Ex. C at #49; Ex. 11).

86. Riddle added these two modules based on observed need and comments Plaintiff made to Riddle about not being trained in the software applications covered by those modules. Riddle set target dates for those modules based on past expected completion times for new forensic chemists for training modules of comparable size. (Ex. A at #35; Ex. 11, Ex. 57 at 26; *see also* Ex. 82 at #24).

87. Items 3, 14, and 15, were smaller portions out of larger training modules. Riddle set target dates for those based on past expected completion times for new forensic chemists for those modules, adjusted down based on the approximate proportion of the modules included in this training plan. (Ex. A at #36; Ex. 11; *see also* Ex. 82 at #24).

88. The remaining items on the training plan were existing training modules. Riddle set target dates for those based on past expected completion times for new forensic chemists for those modules. (Ex. A at #37; Ex. 11; *see also* Ex. 82 at #24).

89. Riddle made sure to set the target date for each item in the training plan to provide equal to or more time than the target dates would provide for that item in a new trainee's initial training program. This was true even though when completing an initial training program, other trainees

have cases to work while meeting the target training dates. (Ex. A at #38-39; *see also* Ex. 82 at #24).

90. Plaintiff stopped receiving new cases during her training program. She was expected to focus on her training program. Plaintiff's other tasks, such as cleaning and instrument maintenance, were also removed so she could focus on her training program. Plaintiff was initially advised she could continue to work on cases but Plaintiff asked for her existing cases to be reassigned so she could focus on her training. (Ex. A at #40-41; Ex. C at #60; Ex. 57 at 16:22-23; *see also* Ex. 9).

91. Plaintiff was presented with the option to test out of any module without any penalty based on the result. Plaintiff refused to attempt to test out of any of the modules. (Ex. A at #42; Ex. 81 at #47).

92. Plaintiff acknowledged at the meeting that she wants, "to be with the team, to be up to the standard that everybody else on the team is. And I'm missin' a lotta parts." (Ex. 57 at 30:12-14.)

93. Plaintiff was also informed she would be put on what the State calls a special review for 90 days. Managers in Kansas are trained in the use of special reviews for classified employees. The KBI is not required to use a special review process for its unclassified employees, like Plaintiff, but voluntarily did so in this instance. (Ex. C at #50; Ex. 57 at 16, 34; Ex. D at #24-26; Ex. 35 at OAG008129-34; Ex. 36 at OAG008173-75).

94. It was explained to Plaintiff that she was only expected to complete the first seven sections during the 90-day special review. (Ex. C at #51; Ex. 57 at 34-35).

95. Plaintiff stated, "Oh yeah, we can probably do that in 90 days." (Ex. 57 at 35:1).

96. On July 28, 2022, Plaintiff signed the 90-day special review form. (Ex. C at #52; Ex. D at #18; Ex. 30).

97. Plaintiff fell behind on completion of the training schedule, failing to complete the first two sections within the planned timeframe, completing the LIMS training on August 29, 2022 and Qualtrax training on September 1, 2022. (Ex. C at #53; Ex. 12; *see also* ECF 113 at ex. stip. iv; Ex. A at #44).

98. Plaintiff showed up late for her Qualtrax exam on September 1, 2022. (Ex. A at #22-23; Ex. 7).

99. Qualtrax is a computer database utilized within the KBI laboratories. (Ex. A at #24).

100. On September 15, 2022, Riddle noticed odd results on Broil's Spot Test Exercise. Riddle asked her to demonstrate and perform the Scotts Test on an unknown sample and she refused to do the demonstration. Broil insisted that Riddle demonstrate the test first. After the two of them met with Knox, Broil changed her position and correctly demonstrated the Scotts Test, although she obtained different results compared to her earlier training exercises. (Ex. A at #25-26; Ex. 8).

101. Riddle set up regular meetings in-person meetings to answer training questions from Plaintiff and let her know he was available for questions even when working from home. (Ex. A at #27-29; Ex. 7, 9).

102. At the beginning of her retraining, when Riddle was in the office, he was approximately 2 cubicles away from her. At some point during her retraining, Riddle moved into a nearby office, and he was still in the same area of the lab. (Ex. A at #30).

103. Plaintiff regularly asserted she had the information she needed and then later, or at the last minute, would send questions in email form to Riddle. (Ex. A at #31; Ex. 7-9).

104. Plaintiff asked Riddle to put his responses and comments on her questions into a word document rather than talking to her in person and in general preferred things in writing. (Ex. A at #32; Ex. 10).

105. Riddle believed most of Plaintiff's questions to him were in effect wanting him to spoon feed the information to her, but Riddle preferred to direct Plaintiff to where she could find the information. (Ex. 78 at 137).

106. Plaintiff only completed sections 1-5 of the training program during her 90-day special review. (Ex. A at #45; Ex. 12).

107. Plaintiff received a performance review for the 90-day special review with an unsatisfactory rating. (Ex. C at #54; Ex. D at #19; Ex. 31).

108. Broil received the rating in the 90-day Review because she failed to complete the assigned training, had a negative attitude because she did not accept responsibility for her performance and accept assigned tasks, and because of her struggle to communicate her questions clearly and in a timely manner. (Ex. C at #55; Ex. 31).

109. On October 27, 2022, Riddle modified the target dates for the remainder of the modules to make up for Plaintiff being behind on her training. Riddle adjusted the target dates to provide the full amount of time originally budgeted for each remaining module as if the training program were just starting with only those modules. The adjusted target dates are listed on the form for each remaining module. (Ex. A at #46; Ex. 12).

110. The modified training program schedule was agreed by Plaintiff and initialed. (Ex. C at #56; Ex. 12).

111. A new 30-day special review period started on October 27, 2022 through November 26, 2022. (Ex. C at #57; Ex. D at #20; Ex. 32).

112. Under the modified training program, Plaintiff needed to complete two modules, Stimulants and Hallucinogens, during the 30-day special review period. (Ex. C at #58; Ex. 12, 32, 33, and 67; *see also* ECF 113 at ex. stip. iii).

113. In a November 2022, email exchange, Plaintiff requested a formula from Riddle. Riddle would expect a forensic chemist to know that particular formula or at least to know how to find that formula without assistance. As Riddle stated in the email exchange, sometimes the questions in the training program "are intended to allow the trainee to demonstrate expected personal Chemistry knowledge and education." (Ex. A at #48; Ex. 13).

114. Plaintiff would sometimes ask Riddle for the precise reference where particular information might be found in order to answer training questions or exercises. But trainees are expected to review the materials on their own without such shortcuts being provided. (Ex. A at #50).

115. Plaintiff would not ask meaningful questions about the training materials, she took a very long time to complete assignments, and it was only after she submitted an assignment that Riddle would then learn that she was misunderstanding something about the topic. Accordingly, Riddle would often request for her to submit whatever she had done so that he could review it to make sure she was on the right track. (Ex. A at #52).

116. In a November 8, 2022, email, she criticized the training process and requested it be conducted differently. Riddle understood Plaintiff to be effectively insisting the KBI wait however long it took her to complete an assignment despite the delays in her completing the training program. (Ex. A at #51, 53; Ex. 14).

117. Plaintiff failed to complete either of the modules assigned for the 30-day special review and received an unsatisfactory rating. (Ex. C at #58, 61; Ex. A at #54; Ex. D at #21; Ex. 33, 67).

118. Additionally, the previous issues regarding Plaintiff's attitude and communication continued during the 30-day special review. Plaintiff continued to delay asking questions, refused to ask questions in-person, and relied heavily on email communications. (Ex. C at #59;

Ex. 33).

119. Broil had been tasked with changing the oil in two of the instruments. Knox reached out to her to confirm she felt comfortable taking care of this because Knox could reassign it to another individual to take care of while Plaintiff was doing her training. When Plaintiff was indecisive, Knox reassigned the task to another analyst. Ultimately, however, Plaintiff took time away from her training to do the oil change in one instrument and did not complete a single module during her 30-day review. (Ex. C at #61; Ex. 33, 68).

120. In July and August 2022, Broil requested to attend a conference of the Southwestern Association of Forensic Scientists (SWAFS) in Henderson, NV, to be held on October 2-6, 2022. (Ex. C at #62; Ex. 70).

121. Knox discussed the matter in person with Broil on August 11, 2022. Knox asked her to consider if her attending the conference would still allow her to get her training done on time as specified in her special performance review. (Ex. C at #63; Ex. 70).

122. On August 12, 2022, Knox sent Broil an email following up on the matter because Knox had not heard from her regarding whether she had decided if her attending the conference would still allow her to get her training done on time as specified in her special performance review. (Ex. C at #64; Ex. 70).

123. Broil responded on August 12, 2022, saying she had not made a decision. Knox met in person with Broil on August 15, 2022. Knox told her that she was not being approved to go to the SWAFS conference because her first priority needed to be the training program. (Ex. C at #65-66; Ex. 70-71; Ex. 82 at #4).

124. Broil was previously approved to attend several training opportunities. This included webinars, some with a registration fee, which would be paid by the KBI. One of those webinars

took place on September 6, 2022, with a registration fee of $106.25. Additionally, Broil was approved by Henderson for an in-person conference in Anaheim, CA, in February 2020 with a registration cost of $962 and a total other cost of $995 (Ex. C at #67; Ex. B at #11; Ex. 39).

125. On August 24, 2022, Broil asked Knox to approve her application to be a Crime Scene Response Team (CSRT) member and forward it on through the chain of command to the Assistant Special Agent in Charge for that team. (Ex. C at #68; Ex. 72).

126. The same day, Knox responded and let Broil know that Knox was denying the request because the timing was not ideal when she was currently on an intense individualized training plan, scheduled to extend into the beginning of 2023. I told her that her focus needed to be on her training at hand. (Ex. C at #69-70; Ex. 72; *see also* Ex. 82 at #4).

127. The Crime Scene Response Team receives calls at unpredictable times that take them away from their regular work to go examine a crime scene. Being on that team would add additional responsibilities to an employee's job duties and also require additional training specific to the Crime Scene Response Team. (Ex. C at #71).

128. Based upon the two unsatisfactory special reviews due to Plaintiff failure to progress through her retraining, Plaintiff was terminated on December 5, 2022. (Ex. C at #72; Ex. D at #22; Ex. 34; Ex. 79 at 69:15-23; *see also* ECF 113 at ex. stip. ii).

129. A meeting was held on December 5, 2022, with Henderson informing Broil of the termination of employment. (Ex. B at #4; Ex. 37).

130. KBI Director Thompson made the ultimate decision to terminate Broil. Henderson did not have confidence in Broil's work or ability to testify. Price recommended that Broil be terminated. (Ex. B at #6; Ex. 79 at 51:15-52:3).

131. On November 10, 2021, Plaintiff informed Christa Knox of an alleged incident that

occurred on October 11, 2021, in which co-worker Jim Schieferecke is alleged to have spoken about a "negro virus" being developed at the Wuhan Lab in China. (Ex. C at #73; Ex. 69).

132. Christa Knox discussed the matter with Jim and he did not remember saying anything offensive. He thought about conversations Plaintiff may have overheard and provided me with a printout regarding a study about Nipah virus research at the Wuhan Institute. (Ex. C at #74; Ex. 69; Ex. 82 at #18-19).

133. In his deposition, Jim stated that he was discussing the Nipah virus with Bianca Bailey when Plaintiff approached him to ask if he said negro virus. He responded saying he said nipah virus. (Ex. 80 at 72:5-6).

134. Jim relayed that he had heard about the Nipah virus on the Dan Bongino show. (Ex. 80 at 74:2-16).

135. Knox admonished Jim that, although she understood that he did not remember saying anything offensive, offensive language will not be tolerated, and to avoid any further incidents arising, she would reassign Jim and Plaintiff to different instruments. (Ex. C at #75; Ex. 69; Ex. 82 at #8).

136. Schieferecke stated he was sorry for the misunderstanding and wished the matter had been raised immediately for clarification. Jim accepted the reassignment of instruments. (Ex. C at #76; Ex. 69).

137. A meeting was held on November 30, 2021, with Mary Henderson, Christa Knox, Rebeka Stanley, and Plaintiff. Christa relayed that Jim and Bianca were advised to make sure every conversation is work appropriate and the work assignments and instrument assignments for Jim and Plaintiff were put into place to avoid any future conflict. (Ex. B at #28; Ex. 46).

138. Plaintiff also alleged Schieferecke shared an inappropriate DVD in May 2021 that

included sexual content. Plaintiff previously discussed a DVD with Henderson but did not state who gave her the DVD or state what the issue was. (Ex. B at #13; Ex. 45; Ex. 77 at 43:10-15).

139. Henderson scanned the DVD for overtly offensive themes and did not observe any. Henderson suggested Plaintiff return the DVD and say that type of movie wasn't for her. (Ex. B at #13-17; Ex. 43; Ex. 82 at #18-19; Ex. 77 at at 40:21-41:8).

140. Henderson was also discussed with Plaintiff about a dispute with Schieferecke involving the use of an instrument. Schieferecke was using the instrument and Plaintiff attempted to kick him off of the instrument. Schieferecke raised his voice. It was ultimately determined that both individuals acted inappropriately in the incident. (Ex. B at #18-23; Ex. 44; Ex. 82 at #8).

141. Plaintiff completed the KBI required Kansas Human Rights Commission On-Line Harassment and Prevention training from 2019-2021. (Ex. D at #9; Ex. 20-22).

142. Plaintiff completed and filed an Assurance Regarding Harassment, Discrimination, and Retaliation in June 2019 that indicated no harassment or discrimination to report. (Ex. D at #10; Ex. 23).

143. Plaintiff filed the replacement form, Productive Work Environment Advisory form on June 13, 2022, that alleged events prior to 2022 but indicated no current harassment or discrimination to report for 2022. (Ex. D at #11-12; Ex. 24).

144. KBI Human Resources can handle a complaint without a written form being submitted. (Ex. 77 at 87:21-24).

145. Price had been involved with retraining programs for two other forensic scientists at the KBI, both male. One of the two ended up being terminated for failure to complete the retraining program in a timely fashion. (Ex. 79 at 57:21-58:12, 62:17-63:17).

146. Employees other than Broil had been mandated to attend Fred Pryor trainings. (Ex. 79 at

97:5-13).

147. On May 5, 2022, Plaintiff dual filed an amended complaint with both the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") as charge number 28D-2022-00496. (Ex. F; *see also* ECF 113 at ex. stip. v).

148. On October 24, 2023, Plaintiff received a right to sue letter from the EEOC for charge 28D-2022-00496. (Ex. F; *see also* ECF 113 at ex. stip. v).

149. On February 8, 2023, dual filed a complaint with both the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") as charge number 28D-2023-00374. (Ex. F; *see also* ECF 113 at ex. stip. v).

150. On October 24, 2023, Plaintiff received a right to sue letter from the EEOC for charge 28D-2022-00496. (Ex. F; *see also* ECF 113 at ex. stip. v).

## ARGUMENTS AND AUTHORITIES

### I. Summary Judgment.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *Id.* Facts must be shown through affidavits, deposition transcripts, or incorporated exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. [citation omitted] To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021).

## II. Plaintiff's sex-based discrimination claim is without merit and summary judgment should be entered in favor of the Defendant.

### A. Legal Standards

"Title VII of the Civil Rights Act of 1964 . . . prohibits an employer from discriminating against any individual 'because of such individual's . . . sex.'" *Throupe v. Univ. of Denver,* 988 F.3d 1243, 1251 (10th Cir. 2021) (alteration in original) (quoting 42 U.S.C. § 2000e-2(a)(1)). "[A] plaintiff must present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*." *Bekkem v. Wilkie,* 915 F.3d 1258, 1267 (10th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). "We apply the familiar *McDonnell Douglas* burden-shifting framework when assessing a motion for summary judgment on a claim of sex discrimination." *Throupe*, 988 F.3d at 1251 (citing *Lounds v. Lincare, Inc.,* 812 F.3d 1208 (10th Cir. 2015)); *see also McDonnell Douglas,* 411 U.S. 792. "Under the *McDonnell Douglas* framework, the plaintiff has the burden of presenting a prima facie case of discrimination. The burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions. Summary judgment will be granted if the plaintiff cannot prove the employer's articulated reasons are pretextual." *Id. McDonnell Douglas* is not inflexible and there are different ways to satisfy the prima facie test. *See Tex. Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 253 n.6 (1981); *see also McNellis v. Douglas Cnty. Sch. Dist.,* 116 F.4th 1122, 1139 (10th Cir. 2024) ("We have articulated the elements of a prima facie Title VII discrimination claim differently from case to case.").

"To establish a prima facie case of Title VII discrimination, a plaintiff who is a member of a protected class must show that she experienced an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Oklahoma Bd. of Regents,* 125 F.4th 1321, 1334 (10th Cir. 2025).

"*McDonnell Douglas* held that a plaintiff could raise an inference of unlawful discrimination by satisfying certain prima facie case elements ('*McDonnell Douglas* elements')." *Id.* "[A] plaintiff could establish her prima facie case for wrongful termination by showing (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge." *Id.* "By satisfying these elements, the plaintiff eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job." *Id.*

"[T]he prima facie case requires the employee to demonstrate that he was 'qualified' in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 514-515 (4th Cir. 2006). A Plaintiff must show that he was "meeting his employer's legitimate expectations." *Haynes v. Waste Connections, Inc.* 922 F.3d 219, 225 (4th Cir. 2019).

"For a claim of race or sex discrimination, a prima facie case requires evidence that: "(1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *Ford v. Jackson Nat'l Life Ins. Co.,* 45 F.4th 1202, 1215 (10th Cir. 2022).

"[A]n employment action is adverse if a plaintiff can demonstrate that she experienced '*some harm* respecting an identifiable term or condition of employment' as a result of that action," and "'an employer's action must have left [the plaintiff] worse off, but *need not have left her significantly so*.'" *Scheer v. Sisters of Charity of Leavenworth Health Sys. Inc.,* 144 F.4th 1212, 1216 (10th Cir. 2025) (emphasis and alteration in original) (quoting *Muldrow v. City of St. Louis, Missouri,* 601 U.S. 346, 354-356 (2024)). Requiring an employee to complete training is not per se an adverse action as was stated in *Ford* when reviewing the placement of an employee

on a performance improvement plan ("PIP"): "[i]n our circuit, a PIP, standing alone, is not an adverse employment action." *Ford,* 45 F.4th 1202 at 1226.

If the Plaintiff can establish a prima facie case, "[t]he burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Bekkem v. Wilkie,* 915 F.3d at 1267. "If the employer does so, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.*

**B. Plaintiff claims of discrimination on the basis of sex fail to establish a prima facie case.**

Plaintiff has articulated potentially five allegations of discrimination on the basis of sex, but many of these, such as the special review and remedial training, were ultimately cited in the decision to terminate her employment and may be considered to merge with that action. (ECF 113 at 16 ¶ i). None of the Plaintiff's allegations establish a prima facie case of discrimination.

As to the first element of a prima facie case for wrongful termination and disparate treatment, Defendant does not contest that the Plaintiff is a woman and a member of a protected class. (SOF 2). Defendant *does* challenge that the Plaintiff was qualified for her job. Plaintiff also challenges that Plaintiff was treated less favorably than a similarly situated employees. Additionally, the Defendant followed policy, rather than violated it, when it placed the Plaintiff on a special review and a remedial training program.

**1. Plaintiff was not qualified and thus there is no inference of discrimination in her termination.**

Plaintiff's employment was terminated because she was not qualified for the job and could not progress through the remedial training program. (SOF 128). This fact is established because Plaintiff as a Forensic Scientist III could not complete the remedial training program

modeled on training for a newly hired forensic scientist I. (SOFs 5, 88, 128).

Plaintiff received performance reviews while she was employed with the KBI. (SOF 21). In addition to the annual performance review, Plaintiff received mid-year reviews. (SOFs 26, 59). For the COVID-affected performance review in November of 2020 ("2020 Review"), Plaintiff received a needs improvement performance review for her work performance and efficiency. (SOF 21). She completed her training only on October 20, 2020, a month before the 2020 Review and a year after it was due. (SOF 23).

Plaintiff received a mid-year review on May 20, 2021, ("2021 Mid-Year Review"). (SOF 26). In the review it was noted that Plaintiff still fell below monthly averages on case production. (SOF 27). Plaintiff was struggling with the peer review process and to address that Plaintiff was assigned to only two peer reviewers to make the process easier for her. (SOF 28, 29).

Plaintiff received a performance review on December 21, 2021 ("2021 Review"). (SOF 30). In Plaintiff's 2021 Review, she again received a needs improvement in her monthly case production. (SOF 32). Plaintiff also received a needs improvement on performing all other tasks assigned to her. (SOF 33). Plaintiff missed deadlines and delayed completion of other tasks until the date of the deadline that required additional hours outside of the normal work week to complete. (SOF 33). Plaintiff also received a needs improvement regarding her attitude and accountability. (SOF 31). The feedback for this section discussed the accuracy of Plaintiff's timesheets. (SOF 34). When she was questioned about timecard issues, she was defensive with supervisors. (SOF 35). Plaintiff received a needs improvement for her communication. (SOF 31, 35). Plaintiff failed to clearly communicate with her supervisors through emails. (SOF 35). Additionally, it was noted Plaintiff worked overtime from home without prior authorization. (SOF 36).

Plaintiff requested a meeting to pushback against the negative feedback included in the 2021 Review. (SOFs 37-39). Plaintiff submitted questions and received written responses. (SOF 39, 41-51. Additional clarification was provided at a January 24, 2022, meeting. (SOF 41).

Plaintiff's work performance remained an issue in early 2022. (SOF 52-71). Plaintiff failed to follow policy and create a phone log when she was contacted by a case officer. (SOF 52-55). It was discovered Plaintiff was using the same column when conducting GCMS analysis in violation of policy, a policy the Plaintiff had already completed a refresher for. (SOF 56-58). This resulted in an amended report. (SOF 58). Plaintiff had a nonconformity for logging the prep for the TLC system on a sticky note instead of in the appropriate log sheet. (SOF 61). She was not alone in doing this, but she failed complete the refresher training sent to the chemistry unit before the deadline. (SOF 62-63-60). A report was found with the wrong analysis address in the footer. (SOF 64). Plaintiff was directed to prepare an amended report but failed to follow the instructions for amended reports. (SOF 65-67). For her 2022 Mid-year Review, an increase in quality issues was noted. (SOF 59).

In March of 2022, Knox reviewed the initial training of the Plaintiff. (SOF 69). Based on that review and her performance issues, there was a concern that either the initial training was not adequate or the Plaintiff was not at the level she was hired for as a Forensic Scientist III. (SOF 72).

In an email exchange in May, Plaintiff stated, "Please don't keep telling what I didn't do something before you know if I have been trained/exposed to your request. Please inform me or refer me to someone who can show me what you need, I want so badly to comply." (SOF 73).

Based upon the Plaintiff's performance issues and the feedback from her on a lack of training, it was decided to give Plaintiff remedial training. (SOF 70-76). Plaintiff was placed on a

remedial training program and a 90-day special review. (SOF 79-89). During the special review she was expected to complete only the first seven modules in the training program. (SOF 94). Plaintiff initialed the training program and signed the 90-day special review. (SOF 83, 96).

Plaintiff only completed five of the seven modules during the 90-day review and received an unsatisfactory review. (SOF 106, 107). A modified training program was agreed to and the Plaintiff had 30-days to complete the two modules she had not completed. (SOF 110-112). Plaintiff did not complete either of the modules during the 30-day special review and received an unsatisfactory review. (SOF 128). Plaintiff was subsequently terminated because of the two unsatisfactory reviews and because she failed to progress through the training program. (SOF 128). Plaintiff's performance was accurately reviewed, not falsely so. Plaintiff workload was only modified to allow her to focus on training. (SOF 90).

Plaintiff's failure to progress through the training program establishes she was not qualified for the position of a forensic scientist III. The training program was created by Chris Riddle and was based upon the training a new hire without any previous experience would be required to complete while also completing casework and Plaintiff failed to progress through it. (SOF 89). Plaintiff was fired for inadequate job performance and because she could not meet the KBI's legitimate expectations. (SOF 128). *See Warch,* 435 F.3d at 514-515; see also *Haynes,* 922 F.3d at 225. Plaintiff was not qualified for her position as a forensic scientist III and cannot establish a prima facie case for a discriminatory termination.

**2. Fred Pryor training is not an adverse employment action and Plaintiff was not treated less favorably than a similarly situated employee.**

Plaintiff alleges discrimination on the basis of her sex because she was treated less favorably to a male co-worker, Shieferecke, by being required to attend Fred Pryor training. (ECF 11 at 16 ¶ i). Plaintiff's allegation fails to establish a prima facie case because Fred Pryor

training is not an adverse employment action and she was not treated less favorably. Training is not an adverse action. *See Ford,* 45 F.4th at 1226. Plaintiff's participation in Fred Pryor training did not alter her job duties or factor into her termination. (SOF 48). Plaintiff was not sent to Fred Pryor training as punishment. (SOF 51). Plaintiff had difficulty timely completing tasks and communicating with her supervisors, and she was assigned it to help her improve in those areas. (SOF 50-51). Additionally, Jim was treated less favorably than the Plaintiff. He received a verbal admonishment and was removed from an instrument to avoid any issues in the future. (SOF 135). Plaintiff did not receive a similar treatment. (SOF 137). Fred Pryor training is not an adverse employment action and was not a less favorable treatment. It does not raise an inference of discrimination. Accordingly, the Plaintiff has failed to establish a prima facie case for her claim for sex discrimination based upon her being assigned Fred Pryor training.

**3. Placing Plaintiff on a full, six-month retraining program and special performance review is not a violation of policy.**

Plaintiff being placement on a special review and a remedial training program is not a violation of policy and does not raise an inference of discrimination or pretext. (SOF 82, 93).

The relevant policy on retraining is QM-12. (SOF 83). Section 9 on page 6 outlines remedial training. (SOF 83) This remedial training program was developed by the technical lead Riddle. (SOF 83). He based it upon the circumstances present in this case, including that Plaintiff's initial training was a modified training program and not the full training provided to a new hire. (SOF 9, 79). Because of Plaintiff's performance issues and her saying she was not adequately trained; the remedial training was based upon what a new hire would receive. (SOF # 89). The remedial training is not a violation of QM-12 § 9. (SOF 83). Rather, Plaintiff alleges it violates § 6 which governs training plans for personnel with previous experience. (SOF 83). QM-12 § 6.6 states an, "analyst will be required to complete the full discipline training program in the

event they fail to complete their individualized training program." (SOF 83). Plaintiff alleges an analyst with any experience can only be required to complete the full discipline training program if they fail to complete their individualized training program under QM-12 § 6.6. The plain language of the policy does not say that. It only applies to one circumstance, failure to complete individualized training, and does not limit the scope of a remedial training in § 9.

Managers at the KBI receive training on the use of special reviews. (SOF 93). The use of the special review in this circumstance is in line with that training. (SOF 93). Defendant did not violate policy with the special reviews. (SOF 93). Defendants did not violate policy, there is no inference of discrimination or pretext for failure to follow policy on training employees, and thus Plaintiff cannot establish a prima facie case.

**C. Defendants have a legitimate non-discriminatory reason for each action of alleged sex discrimination.**

Defendant has briefed the issue of Plaintiff's qualifications extensively above. Plaintiff's failure to progress through the remedial training and the two unsatisfactory special reviews were the established basis for her termination. (SOF 128). The documented deficiencies in her performance were the basis for the employment decisions by Defendant. (SOF 128. This includes assigning her Fred Pryor training, which was done to address deficiencies raised in her 2021 Review. (SOF 48).

Plaintiff was terminated because of her unsatisfactory ratings on her special reviews and her failure to progress through her remedial training. (SOF 128). Defendant's reasons for taking each employment action are extensively documented and establish non-discriminatory reasons for each of Plaintiff's alleged actions.

Further, no admissible evidence suggests that Defendant's actions were pretextual, and there is no basis for an inference of intent to discriminate against the Plaintiff on the basis of sex.

## III. <u>Plaintiff's claim of Title VII retaliation is without merit and Defendant is entitled to summary judgment in its favor.</u>

### A. Legal Standard.

"Title VII protects an employee's opposition against 'any practice made an unlawful employment practice' by Title VII" *Dixon,* 125 F.4th at 1339 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove a Title VII retaliation claim through circumstantial evidence under the *McDonnell Douglas* burden-shifting framework." *Id.*

As the Tenth Circuit has stated:

> To state a prima facie case for retaliation under Title VII, a plaintiff must show (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.

*Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012). The first prong, protected opposition to discrimination, requires showing that the plaintiff had an objectively reasonable, good-faith belief that she was engaging in protected opposition to discrimination. *Clark v. Cache Valley Elec. Co.*, 573 F. App'x 693, 700-01 (10th Cir. 2014).

For the second prong, "[t]he test for a *materially* adverse employment action as applied to retaliation claims differs from the test for an adverse employment action applied to discrimination claims." *Benton v. Honeywell Int'l Inc.*, No. 24-2357-DDC, 2026 WL 681719, at *12 (D. Kan. March 11, 2026) (emphasis in original) (*citing Muldrow* 601 U.S. at 357-58). "An employer action is materially adverse if 'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Culp v. Remington of Montrose Gold Club, LLC,* 133 F.4th 968, 977 (10th Cir. 2025) (*quoting Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *White*, 548 U.S. at 68.

"The Tenth Circuit has held that a negative performance evaluation *can* amount to an adverse employment action in certain circumstances." *Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas,* 572 F.Supp.3d 1081, 1098 (D. Kan. 2021). "But typically, this occurs only when the negative performance evaluation later leads to a materially adverse employment action such as termination or a failure to promote." *Id*. "A mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment." *Rios v. Centerra Grp. LLC,* 106 F.4th 101, 112-13 (1st Cir. 2024).

The third prong, causation,

> "can be shown in two ways: by showing that the adverse act bears sufficient temporal proximity to the protected activity, or by showing the existence of facts that suggest that the adverse action occurred because of the protected activity, or a combination of the two."

*Laurent-Workman v. Wormuth*, 54 F.4th 201, 218-19 (4th Cir. 2022). "'Temporal proximity between an employer's knowledge of protected activity and an adverse employment action' may establish causation only if it is 'very close.'" *Id.* at 219 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

> Although there is no bright-line rule for when temporal proximity helps or hurts a cause of action for retaliation, a two-month temporal gap between notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events.

*Id.* (citation omitted).

Ultimately, "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 362 (2013).

**B. Plaintiff claims of retaliation fail to establish a prima facie case.**

The Plaintiff lodges a myriad of supposed adverse employment actions taken against her in retaliation for her complaints of alleged sex and race discrimination by her co-workers, and her EEOC/KHRC complaints. (ECF 113 at 16-17). The majority of the allegedly adverse actions are not in fact adverse actions.

The Plaintiff's placement on a remedial training program, a special performance review, and ultimately fired likely collectively constitute an adverse action. Plaintiff still cannot establish a prima facie case because the Defendant took these actions because of Plaintiff's deficient work performance. Plaintiff cannot establish causation connected to retaliation as to any of her allegations because retaliation is not a but-for reason for her retraining, ultimate termination, or any other action taken by the Defendant.

**1. Plaintiff's November Complaint is not a protected activity under Title VII.**

Under *Iweha,* "protected activity refers to the plaintiff's protected opposition to discrimination made illegal under Title VII." *Iweha v. Kansas,* 121 F. 4th 1208, 1233 (10th Cir. 2024). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]. General complaints about company management . . . will not suffice." *Id.* at 1233-34 (quoting *Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1203 (10th Cir. 2008)). "[T]he absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Id.* at 1234 (quoting *Peterson v. Utah Dep't of Corr.,* 301 F.3d 1182, 1188 (10th Cir. 2002)).

A Plaintiff "doesn't need to show that she reported an actual Title VII violation; rather, she must only show a reasonable good-faith belief that she was opposing discrimination."

*Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018).

> In *Reznik*, the Tenth Circuit articulated the standard governing whether a plaintiff's belief that he or she is reporting conduct prohibited by federal law is objectively reasonable. *See Reznik*, 18 F.4th at 1260. The standard considers "what a reasonable employee would understand about the law and believe in the same or similar circumstances." *Id.* at 1263. This inquiry "involves analyzing the law, the relevant attendant circumstances of [the plaintiff's] job, and the severity, pervasiveness, and duration of the alleged discrimination.

*White v. Five Star Trucking, LLC,* 2026 WL 1703714, at *5 (D. Kan. June 12, 2026); *see also Reznik v. inContact, Inc.,* 18 F.4th 1257, 1262-63 (10th Cir. 2021).

Applying the *Reznik* standards to the current circumstances shows that Plaintiff did not engage in protected activity in her November Complaint. In the November Complaint, Plaintiff alleges that her co-worker, Shieferecke, used a derogatory term as part of a joke about a new virus from Wuhan, calling it a "negro virus." (SOF 131-135). Plaintiff's co-worker disputes this, and believes Plaintiff must have misheard him when he discussed a new Nipah virus with another co-worker. (SOFs 131-135). That aside, as presented in *Five Star Trucking,* "federal law does not typically make unlawful an employee's conduct and instead only imposes liability on the employer." *Five Star Trucking,* 2026 WL 1703714 at *5. Similarly to *Five Star Trucking,* Plaintiff's November 2021 complaint does not allege a violation by the employer. The Court in *Five Star Trucking,* reviewed this complaint in a light most favorable to the Plaintiff and found that it could be construed as a complaint of a hostile work environment. Here, the Plaintiff did bring a hostile work environment claim but it was ultimately dismissed by the Court which found, "that plaintiff's allegations are woefully insufficient to state a hostile-work-environment claim." (ECF 37 at 20 ¶ 2). Defendants agree and contend that it follows that Plaintiff's "woefully insufficient" allegations in the November Complaint are limited to the "negro virus" joke and previously vague complaint about sharing a DVD are not sufficient to establish a protected activity under the *Reznik* standards.

**2. The vast majority of Plaintiff's myriad allegations of retaliation are not on their own adverse actions for a retaliation claim.**

In the Pretrial Order, the Plaintiff presented her allegations of retaliation. (ECF 113 at 16-17 ¶ ii, a). Included with these allegations are as many of twenty other allegations of various conduct that is alleged to be adverse employment actions. (Pretrial Order ECF 113 at 16-17 ¶ a).

We will address each to demonstrate how most of these are not an adverse action. For the alleged refusal to file a complaint, this is not an adverse action. Plaintiff received training on how to report matters, was able to report matters to HR and was even able to meet with HR in several meetings. (SOF 141-144; Ex. 20-24). The meeting notes for the meeting on November 30, 2021, show that Plaintiff was informed at the meeting and in the meeting notes how to write a written complaint. (SOF 137, Ex. 46).

Plaintiff was previously approved to attend both out of state and virtual conferences. (SOF 124). Only during her special review and remedial training was her request to attend a Southwestern Association of Forensic Scientists ("SWAFS") denied. (SOF 123). A denial of a training opportunity is not a materially adverse action unless the plaintiff ties it to a material adversity "such as a hampered ability to perform [her] job or the loss of future advancement opportunities . . . stemming from the denial of . . . training." *Jimenez v. McAleenan*, 395 F. Supp. 3d 22, 39 (D.D.C. 2019). Similarly, Plaintiff was denied her supervisor's approval to apply for a CSRT position during her special review and remedial training. (SOF 125-27). This is a collateral position, not a promotion, and not an adverse employment action. (SOF 127). As discussed above in the briefing for Plaintiff's sex discrimination claim, Fred Pryor is not an adverse employment action under either the lower standard for material adverse action under a discrimination claim or the higher materially adverse standard for retaliation claims. See *Benton v. Honeywell International Inc.,* 2026 WL 681719 at *12. "[R]emedial training is not an adverse

employment action" for purposes of a retaliation claim under Title VII "because it was intended to help" the employee. *Moye v. Tregre*, No. 22-30341, 2024 WL 65424, at *3 (5th Cir. Jan. 5, 2024) (citing *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 431 (5th Cir. 2023) (citing *Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021))).

Plaintiff was not given a special quota. (SOF 47). Even so, Plaintiff's production goals were lower than what is expected of an experienced chemist. (SOF 47). It is not an adverse action to have lower work goals than similarly situated individuals. The next set of allegations are not adverse actions, "not updating Plaintiff's equipment; interfering with her ability to do her job; refusing to answer Plaintiff's questions; unfairly criticizing Plaintiff; soliciting complaints about Plaintiff from her colleagues and asking peer reviewers document any potential issue or mistake. . . restricting Plaintiff's peer reviewers; prohibiting Plaintiff from asking questions of colleagues. requiring Plaintiff provide daily accounts of all of the work performed; requiring Plaintiff attend special meetings with her supervisor; excluding Plaintiff from group meetings, treating Plaintiff with hostility, and prohibiting Plaintiff from working from home without a detailed plan" (Pretrial Order ECF 113 at 16-17). Nor is the decision to record meeting conversations or her negative performance evaluation. They fall into categories of work actions that are not materially adverse; "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Culp v. Remington of Montrose Gold Club, LLC,* 133 F.4th at 977.; *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (saying "simple lack of good manners" does not "deter victims of discrimination from complaining to the EEOC"). Receiving the "cold shoulder," the "silent treatment," or being "shun[ned]" by coworkers does not constitute a materially adverse employment action. *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1216 (10th Cir. 2010). Being monitored and documented by co-

workers does not rise to the level of an action that a reasonable employee would consider materially adverse. *Harris v. Sec'y of U.S. Dep't of Veterans Affs.*, No. 22-2489-HLT, 2024 WL 3010879, at *11 (D. Kan. June 14, 2024) (citing *Lewis v. Wilkie*, 909 F.3d 858, 869 (7th Cir. 2018)).

Plaintiff also alleges she was prohibited from performing "substance analyses" i.e. her case work. (Pretrial Order ECF 113 at 16-17 ¶ a). Plaintiff was advised at the July 28, 2022, meeting when going over the training plan that she could continue with some case work. (SOF 90). She requested to have her case work reassigned to focus on her training. (SOF 90). Asking for your case work to be reassigned while you focus on training is not an adverse employment action.

**3. The timeline for Defendant's employment actions establish they not temporally close to Plaintiff's complaints.**

There are two dates during her employment with the Defendant where Plaintiff alleges, she complained about discrimination she was experiencing at work. The first is November 10, 2021 ("November Complaint"). The second is her dual-filing of a complaint with the KHRC and EEOC on May 5, 2022 (EEOC Complaint). (ECF 113 at 16 ¶ ii).

The most significant events (remedial training, special review, and termination) did not occur until 8 to 12 months after the November Complaint. (SOF 128, 147). There is no temporal proximity between any adverse employment action and the November Complaint. Plaintiff does allege she was given a negative review on December 21, 2021 ("2021 Review"), but a review is not an adverse employment action. See *Kincaid,* 572 F.Supp.3d at 1098. While the 2021 Review included a number of deficiencies, the review itself stated her overall performance was meets expectations. (SOF 30). Plaintiff was eventually terminated, but her termination was based upon unsatisfactory ratings in her 90-day special review, 30-day special review, and failure to progress

through her remedial training, not the 2021 Review. (SOF 128).

Applicable actions begin almost three months after the EEOC Complaint date, filed May 5, 2022 and her special review and training began on August 1, 2022. (SOF 147 & 84). None of Plaintiff's allegations occur in "sufficient temporal proximity" to establish a causal connection. See *Laurent-Workman v. Wormuth*, 54 F.4th at 218-19. Absent the "sufficient temporal proximity" of *Wormuth,* the Plaintiff was may demonstrate "the existence of facts that suggest that the adverse action occurred because of the protected activity." *Id.* All of Plaintiff's allegations fail here.

Defendants have established a long timeline of performance issues involving the Plaintiff going back to her time training and through her termination (SOF 11, 128). Plaintiff asked for training and was provided training. (SOF 73, 79). All roads for each of the actions of the Defendant lead back to Plaintiff's job performance, not retaliation. As such, Plaintiff cannot establish that her protected activity is the but-for cause of the alleged adverse employment actions of the Plaintiff. Accordingly, Plaintiff cannot establish a causal connection between any protected activity by her and any adverse employment action of the Defendant.

**C. Defendant's actions were for legitimate, non-retaliatory reasons.**

Defendant adopts its above briefing and restates that each action, was done for legitimate, non-retaliatory reason that the Plaintiff demonstrated work deficiencies that required coaching or training. This ultimately led the decision to place her on a remedial training program and two special review periods. Plaintiff was terminated after receiving unsatisfactory ratings in her special review and for failing to progress through her remedial training. Defendant's actions were taken to facilitate Plaintiff's training and to focus her time on the training.

**D. Defendant's actions were not pretextual and there is no basis for an inference of intent to retaliate against the Plaintiff.**

Plaintiff appears to offer only one reasons for why Defendants legitimate reasons are pretextual, a violation of policy.

> This is retaliatory because Plaintiff successfully completed her initial personalized training program. . . It is only when an experienced scientist fails to complete that individualized-training program, that an experienced scientist is required to go back and start the training program from the beginning as if they were newly graduated from college, without experience.

Pretrial Order ECF 113 at 8 ¶ 3.

As was previously briefed above, this is simply incorrect. The referenced policies allow for remedial training and special review periods. Defendant's action did not violate policy.

## IV. <u>Plaintiff has failed to exhaust administrative remedies</u>

Defendants previously raised the issue of failure to exhaust administrative remedies for alleged events more than 300 days prior to Plaintiff's first EEOC charge filed on May 5, 2022. (ECF 25 at 2). The Court previously addressed this issue as it relates to Plaintiff's now dismissed hostile-work-environment claims. (ECF 37 at 9). Defendant renews its defense of failure to exhaust as to those allegations identified in the Court's previous order as to the remaining claims of sex discrimination and retaliation. (ECF 37 at 8-9; *see also* ECF 113 at 5-6).

For these reasons, the Defendant requests that summary judgment be granted in its favor.

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ James Eric Todd*
James Eric Todd, KS No. 24297
Assistant Attorney General
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612-1597
James.Todd@ag.ks.gov
Tel: (785) 296-2215
Fax: (785) 291-3767
*Attorney for the Defendant*

Matthew L. Shoger, KS No. 28151
Assistant Attorney General / Deputy Chief Counsel
Kansas Bureau of Investigation
1620 SW Tyler St.
Topeka, Kansas 66612
matt.shoger@kbi.ks.gov
(785) 296-8200
Fax: (785) 296-0915
*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th of July, 2026, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Erin N. Vernon
Sylvia Hernandez
erin@bvtrialattys.com
sylvia@bvtrialattys.com
Baldwin & Vernon Trial Attorneys, LLC
108 South Pleasant Street
Independence, MO 64050
*Attorneys for Plaintiff*

*/s/ James Eric Todd*
James Eric Todd
Assistant Attorney General