**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | | |
|---|---|---|
| **DEBORAH (DC) C. BROIL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 2:24-CV-02029** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STATE OF KANSAS, KANSAS BUREAU OF INVESTIGTION AND ITS REPRESENTATIVES** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH SUGGESTIONS IN SUPPORT THEREOF**

Plaintiff, D.C. Broil ("Broil"), by and through her attorneys of record, and pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, provides the following facts, arguments, and authorities to demonstrate why the Court should deny Defendant's Motion for Summary Judgment ("Motion") (Doc. 119).

## I. INTRODUCTION

Broil alleges that Defendant Kansas Bureau of Investigation (hereinafter "KBI") discriminated against her based on her sex and retaliated against her for her complaints of discrimination. Broil has two remaining claims: Count II, sex discrimination in violation of Title VII and Count III, retaliation in violation of Title VII. Pretrial Order (Doc. 113) § 4.a.i-ii. Remaining at issue are the following adverse actions: the retraining program imposed on July 28, 2022, the 90-day and 30-day special performance reviews that followed, and her December 5, 2022 termination. PSOF 36, 44, 63, 71.

DC Broil is, and has been for more than sixteen (16) years, an expert forensic chemist. Plaintiff's Statement of Additional Facts ("PSOF") 1, 65. From the moment she received her KBI

work authorizations, the KBI has certified that she is an expert forensic chemist qualified to perform unknown substance analyses and to testify in criminal prosecutions that resulted in defendants losing their freedom and basic rights. PSOF 3, 66. Even after her termination, the KBI continued to hold her out as an expert forensic chemist, working with prosecutors and Broil to coordinate her expert forensic chemist testimony. PSOF 82.

The extensive record in this case (thousands of pages and 15 depositions) establishes that the KBI's treatment of Broil changed and the KBI began taking unprecedented retaliatory actions after she complained internally on November 10, 2021, which her Chemistry Supervisor admitted was a complaint of sex and race discrimination and harassment. PSOF 7-10. That retaliatory and discriminatory treatment culminated in Broil's placement on a remedial training program anticipated to last more than six months, and on a special performance review plan, both on the same day her mid-year review's only two ratings were "meeting expectations" and "exceeding expectations." PSOF 36, 44, 52. Four days later, KBI removed her from her casework. PSOF 58.

KBI's Motion for Summary Judgment asks this Court to ignore its serious and unwavering endorsement of Broil's skills as an expert forensic chemist. At the same time, it asks this Court to believe, and to rule as a matter of law, that KBI had no choice, and no discriminatory or retaliatory motive, when it took each of those steps, treating her as though she were a new graduate with no experience. PSOF 84; Plaintiff's Response to Defendant's Statement of Facts ("RDSF") 145. In fact, every performance review Broil ever received provided an overall rating of meeting or exceeding expectations until after KBI placed her on a special performance plan that did not evaluate any of her regular job duties. PSOF 34, 51, 58; RDSF 31-32. And while it did all of this, KBI was simultaneously sending her to court, twice, to testify as its expert in criminal prosecutions, where its own retraining designer rated her testimony four out of five. PSOF 64, 65.

Broil was hired as an experienced forensic chemist, a "wealth of knowledge" in her supervisor's words and completed the individualized training program KBI designed for her, with every required signature on her Completion of Training Approval. PSOF 1, 2, 4. Thirty days after her complaint, KBI sought permission to record its meetings with her, a step its Assistant Laboratory Director, Mary Henderson, had never sought for any other employee, and its Associate Director wrote, "Mary believes we may be in a pre-litigation posture with her." PSOF 14. Broil's supervisor opened a log on her and told her peer reviewer to document her mistakes, an instruction given for no one else. PSOF 17. Broil filed a charge of discrimination on May 5, 2022. PSOF 79. Eighty-four days later, KBI imposed a full new employee remedial retraining program and the 90-day special review. PSOF 36, 44.

KBI says it did so because her initial training was deficient and she then "failed to progress." Its own witnesses and documents contradict each part of that explanation.

No policy required the program; the policy KBI cites forbids it: QM-12 permits remedial training only for a demonstrated deficiency, and KBI's Rule 30(b)(6) designee agreed that KBI "couldn't find a single actual issue that she actually demonstrated having as it relates to conducting any of these drug analyses." PSOF 39-43; RDSF 82, 145. Broil did ask for training related to the KBI's software systems like LIMS, LAMS, and Qualtrax she never received. Def. SOF 76; PSOF 53; RDSF 79, 83. The program gave those one week each and spent twenty-one of its twenty-eight weeks on drug classes she was already, and continued to be, authorized to analyze. PSOF 52, 53. The forms for the program and for the special review that would judge it were drafted together on July 19, 2022, nine days before she saw either, and the draft review defined the only way to fail before the program began: not passing every module by its target date. PSOF 51. The materials the program tested on did not exist when its deadlines began to run; KBI's QA Manager wrote, "I

don't know how we can use/grade this as it stands." PSOF 59. Her peer reviewer was ordered not to answer her questions. PSOF 61; RDSF 103, 105, 113-116. Its designer testified that a narrower program was never considered because the goal was to "eliminate that excuse." PSOF 84. The special review was ordered in May on grounds that had nothing to do with her work, dropped in June because "pure #'s [numbers] don't support it," and imposed in July on a third reason. PSOF 30, 50. Target dates, KBI's designee testified, are not requirements for any employee. PSOF 69. The failing review was drafted before the review period ended, and the termination paperwork was ordered before the final review closed, with a decision to keep it from her so it would not "hinder her training." PSOF 67, 71. The Director who signed the letter had "only indirect knowledge," reviewed no documents, and asked no question about retaliation. PSOF 73, 75-77; RDSF 130. In twenty-five years, the only other chemist KBI has terminated was terminated after his arrest. RDSF 128.

KBI asks the Court to accept, and to rule as a matter of law, an explanation that its own supervisor, trainer, designee, and Director have each contradicted under oath. An employer's proffered reason should not be ruled truthful a a matter of law when its own witnesses have testified that it is not. On this record a jury would not only be permitted to disbelieve KBI's explanation - but it would have every reason to. KBI's Motion should be denied in its entirety.

## II. <u>PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF FACTS</u>

In a case where 12 depositions of Defendant's current KBI employees or corporate representatives were taken and an additional deposition taken of one of the KBI's former managers, only 18 of the 150 Defendant fact paragraphs cite any sworn deposition testimony of those individuals. KBI's facts heavily rely on four declarations its managers signed in July 2026, after discovery closed: a declaration is the first-listed support for 125 of the 150 paragraphs, and

some rest solely on one declaration. Where a response below states that a fact "rests solely on" a declaration, Plaintiff relies on *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030-31 (10th Cir. 2022) (conclusory, self-serving affidavits are insufficient); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *see Benton v. Honeywell Int'l Inc.*, No. 24-2357-DDC, Doc. 71 at 8 (D. Kan. Mar. 11, 2026). Where a response states that a matter is a characterization or a question of state of mind, Plaintiff's position is that it is not a fact capable of being uncontroverted and is for the jury. *Int'l Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 906 F. Supp. 645, 651 (M.D. Fla. 1995) (evidence of state of mind insufficient to warrant summary judgment as it is question for factfinder).

For the purposes of summary judgment only, Plaintiff provides the following responses to Defendant's Statement of Facts. Each response below refers with particularity to the record, D. Kan. Rule 56.1(b)(1). For clarity, please see Plaintiff's Exhibit E for exhibit abbreviations used in Plaintiff's Opposition. Plaintiff's Exhibit E1 is a timeline of key events, with the record citation for each entry. The following facts are uncontroverted: 1, 2, 3, 4, 5, 6, 7, 9, 12, 13, 16, 17, 18, 19, 20, 22, 25, 26, 30, 38, 39, 40, 41, 42, 43, 45, 49, 52, 54, 57, 58, 61, 62, 64, 65, 66, 67, 69, 76, 77, 78, 81, 84, 85, 92, 94, 95, 96, 99, 101, 102, 104, 107, 109, 111, 112, 120, 121, 122, 124, 125, 126, 129, 131, 132, 134, 141, 142, 144, 147, 148, 149.

Many of KBI's facts are only partially true, and a large number are misleading because KBI left out context, the rest of the testimony, or evidence contradicts it. However, due to the facts being immaterial because KBI does not contend any of them were a basis for the retraining program, the special reviews, or the termination and due to page limit restrictions not permitting Broil to partially controvert all controverted facts, Broil does not controvert the following KBI's facts: 8, 10, 15, 27, 36, 37, 46, 53, 98, 106, 127, 136, 138, 139, and 150. The record in this case

supporting Broil's claims and controverting KBI's facts was far more substantial than could be utilized in opposition to this Motion within the page limitations. Should the Court find any fact not adequately supported or addressed, Broil respectfully requests the opportunity to supplement under Fed. R. Civ. P. 56(e)(1).

**<u>Plaintiff's Responses to Defendant's Controverted Facts</u>**

**11. CONTROVERTED IN PART.** CONTROVERTED as to "failed to complete the initial training within the established timelines." Broil was released for controlled substance casework on October 11, 2019, and fully released in March 2020. D. Ex. 4; D. Ex. 59, OAG1051. The Topeka laboratory closed on March 23, 2020, she was mostly on administrative leave through May 8, 2020, and KBI did not issue her a laptop until June 25, 2020. D. Ex. 82, Def.'s Answers to Pl.'s Interrogatories ("Interrog.") No. 22; P. Ex. F, Def.'s Resps. to Pl.'s First Requests for Admission ("RFA") Nos. 14, 18, 19. Knox herself attributed the delay to "a delay in getting her a laptop and then in working with Patrick's schedule." D. Ex. 59, OAG1051. UNCONTROVERTED that the final module was completed on October 13, 2020.

**14. CONTROVERTED IN PART.** CONTROVERTED as to the stated cause, which is pretextual. D. Ex. 38 gives the reason as "guidance and training on note taking/writing of evidence descriptions" and "consistency … with the section in general," and KBI's training summary attributed the difficulty to "the variability of approach taken by various scientists in the lab." D. Ex. 4, OAG1062; *see also* D. Ex. 3, OAG2030; D. Ex. 27. UNCONTROVERTED that the reviews were assigned to Riddle and Royel.

**21, 23. CONTROVERTED IN PART.** UNCONTROVERTED that the 2020 Review contains those ratings and references the extensions. CONTROVERTED as incomplete. The same review notes that Broil was "only in the lab 50% of the time after coming back in June." It says the delay

was "partially due to COVID" and rates her overall performance: "Meets Expectations." D. Ex. 26, OAG3167-A, 3168-A, 3171-A. KBI's quarterly training record attributes every delay recorded in 2020 to COVID-19 or to KBI scheduling. P. Ex. G, OAG2035-40.

**24. CONTROVERTED.** D. Ex. 26 does not say "many corrections." It states the reviews "were a bit shaky during the beginning of this review period in working with multiple trainers," and that "[a]s you gained more experience, your note taking became clearer and more concise and you had less errors upon review." D. Ex. 26, OAG3171-A.

**28-29. CONTROVERTED IN PART.** CONTROVERTED as to cause and as to intent ("not as a punishment"), a state-of-mind assertion that rests solely on Henderson's declaration, is pretextual, and is for the jury. D. Ex. B ¶ 26. KBI's training summary attributed the same problem a year earlier to "the variability of approach taken by various scientists in the lab." D. Ex. 4, OAG1062; *see also* D. Ex. 3, OAG2030; D. Ex. 27. UNCONTROVERTED that the review says this and that Broil was assigned two reviewers.

**31-32. CONTROVERTED IN PART.** UNCONTROVERTED that those four sub-categories were marked needs improvement, including monthly case production. CONTROVERTED as to "a number of deficiencies" and "fell short." The 2021 Review rated Broil "Meets Expectations" overall, "Exceeds Expectations" on Task 2 and on monthly case files reviewed, "Exceptional" on amended reports, and "Meets Expectations" on every other task and competency, D. Ex. 28, OAG3176-81, and at 25 reports a month, she missed the production threshold by one report. *Id.*; P. Ex. H, OAG6468.

**33, 48. CONTROVERTED IN PART.** CONTROVERTED as to "failed to timely complete tasks." Knox's own written answer states the professional goals and the confidentiality and facility access forms were "done by the deadline." D. Ex. 50 at #5, OAG1818. UNCONTROVERTED

that the FMLA training certificate was submitted on October 8, 2021, after its May 31, 2021 due date, and that Knox's answer says what Fact 48 quotes.

**34. CONTROVERTED IN PART.** CONTROVERTED as to "defensive," a characterization, not a fact. Asked whether she had reported her time correctly, Broil told Knox she "will not lie, cheat, or try to steal time." P. Ex. I, OAG1701; D. Ex. 50 at #7, OAG1820. CONTROVERTED as to "multiple occasions" and "timesheet errors": the only support is the review's own statement, which Knox's declaration repeats without adding an occasion, a date, or an error. D. Ex. C ¶ 22; D. Ex. 28, OAG3178. To the extent the review is offered for its truth, Plaintiff objects under Fed. R. Civ. P. 56(c)(2). UNCONTROVERTED that the 2021 Review contains this statement.

**35. CONTROVERTED** as to accuracy. The only support is the review's own statement, which Knox's declaration repeats without an example. D. Ex. C ¶ 23; D. Ex. 28, OAG3179. The review itself says only that Broil "struggle[s] at times to communicate clearly with your supervisor in email communications" and that she is "able to communicate with [her] peers professionally." D. Ex. 28, OAG3179. It is dated forty-one days after her November 10, 2021 complaint. No review before the complaint found any communication issue: the 2020 Review rated Communication "Meets Expectations" ("You communicate clearly with internal and external customers"), D. Ex. 26, OAG3169-A to 3170-A. To the extent the review is offered for its truth, Plaintiff objects under Fed. R. Civ. P. 56(c)(2). UNCONTROVERTED that the 2021 Review contains this statement.

**44. CONTROVERTED.** "[S]howed a lack of understanding" is Knox's characterization. Her own written answer identified one case, with "misspellings on the report" and an item that "should have been sub-itemized," and conceded the "CQ" term "is not applicable to you." D. Ex. 50, OAG1815-16.

**47. CONTROVERTED.** The cited source is Knox's own characterization, D. Ex. 50 at #4;

Broil's 2021 case review numbers were rated "Exceeds Expectations," and her production was one case short of "Meets Expectations." D. Ex. 28, OAG3176-77.

**50. CONTROVERTED IN PART.** UNCONTROVERTED that the declaration and D. Ex. 50 contain these characterizations. CONTROVERTED as to "defensive" and "not forthcoming." In the instances Knox describes, Broil provided what was asked. D. Ex. 50, OAG1819-20. What Broil reported on November 10, 2021 was, in Knox's words, "a complaint of racial discrimination" and "sexual harassment," D. Ex. 76, Knox Dep. 48:13-25, and those labels first appear in the review that closed forty-one days later. D. Ex. 28, OAG3178.

**51. CONTROVERTED IN PART.** UNCONTROVERTED that the declaration and interrogatory answer describe the classes as stated. CONTROVERTED as to the reason for the assignment, a state of mind and pretextual. On February 23, 2022, Knox assigned her, and no one else, a class titled "Dealing With Difficult People," with the lesson "Be positive about people, not paranoid." D. Ex. 76, Knox Dep. 64:23-65:20; P. Ex. J, OAG6962. Knox never assigned Schieferecke any Fred Pryor training although he yelled at her "a few" times. D. Ex. 76, Knox Dep. 61:3-13.

**55. CONTROVERTED IN PART.** UNCONTROVERTED that Knox's declaration states her concern. CONTROVERTED as to "having been previously trained." The written procedure and the training came after the incident, D. Ex. 61, OAG1009; Broil wrote this "was my first contributor contact," *id.* at OAG1003; and KBI's designee testified its training "did not include LIMS training," which "was evidently not sufficient." P. Ex. K, Henderson 30(b)(6) Dep. 78:1-11. No corrective action request was ever implemented for any non-conformity of hers, all of which fell within QM-08 § 5.1 (a clear-cut cause resolved by a single documented action) and none of which compromised the quality of the work or the integrity of the evidence. *Id.* at 51:1-

14, 52:6-12, 54:12-18.

**56. CONTROVERTED IN PART.** UNCONTROVERTED that this occurred. CONTROVERTED as to "was using," which suggests a practice, and as incomplete. Knox wrote, "We think this is a recent occurrence," and after checking the prior months, "There were no other cases where using the same column was an issue." D. Ex. 62, OAG1628; P. Ex. L, OAG6662. The same email says, "This is a violation of policy, but does not affect results," and the "similar nonconformity in Pittsburg" it cites involved two other chemists with "Corrective Actions: None." *Id.*; P. Ex. M, OAG6467.

**59-60. CONTROVERTED IN PART.** UNCONTROVERTED that the 2022 mid-year review lists these items. CONTROVERTED that the "3 additional amended reports" were Broil's errors. One was another author's error on a report she reviewed, and "[t]he writer of the report assumes responsibility for the report." P. Ex. K, Henderson 30(b)(6) Dep. 46:22-47:9. One is the same-column amendment. D. Ex. 54, OAG1993. The one she authored was a footer address generated by the assignment code, a mistake Riddle testified is "occasionally made by forensic scientists," is not a non-conformity, and needs no retraining. D. Ex. 78, Riddle Dep. 112:9-113:8. Knox's own tracker: "Case File Review Nonconformities: None to date." P. Ex. N, OAG6500.

**63. CONTROVERTED** as to "retraining" and "delayed." The assignment was a Qualtrax SOP refresher sent to the entire chemistry section, D. Ex. 64, OAG1629; Broil completed it the next business day after the Friday deadline, P. Ex. O, OAG2043, and no evidence identifies any actual delayed resulted. UNCONTROVERTED that it was not completed by April 1 and that Knox set April 4 as the new date.

**68. CONTROVERTED.** Neither source describes escalating "performance issues." Henderson asked Price to take over "personnel matters involving Broil" because she "was not

having any success in moving the situation in a positive direction," D. Ex. B ¶ 33, and testified she handed them off because "I had not been able to make a positive impact in the situation." D. Ex. 77, Henderson Dep. 44:18-45:5.

**70. CONTROVERTED.** Riddle solicited the Weeks email: on March 8, 2022, he asked her, "Do you have any specific concerns (or compliments) you would care to share?" D. Ex. 6, OAG1667. Weeks answered she herself makes "many clerical errors in my reports/notes," has "seen many in other chemists' reports/notes as well," and "DC is not an exception to this." *Id.* at OAG1665. Royel, asked the same question, had "nothing negative to say as there are no quality issues that should be of concern," and Gannaway "didn't see anything out of the usual." P. Ex. P, OAG6657; D. Ex. 78, Riddle Dep. 147:7-12.

**71. CONTROVERTED.** The fact rests solely on Riddle's declaration. D. Ex. A ¶ 7. The reviewers he asked said the opposite: Weeks, "very understanding to my 'corrections'", D. Ex. 6, OAG1665, and Royel and Gannaway likewise. Worley: "if you gave her suggestions for improvement, she was very receptive to that." P. Ex. Q, Worley Dep. 74:23-75:5.

**72. CONTROVERTED IN PART.** CONTROVERTED as incomplete. Price wrote that "one of two things happened here": either KBI "did prioritize the initial training of DC to complete it in the time in which we prescribed," or "[t]he scientist was not at the level in which we thought they were." D. Ex. 59, OAG1050. Price, who recommended hiring Broil as an experienced chemist, D. Ex. 79, Price Dep. 110:17-111:2, expressed no concern about her before her November 10, 2021 complaint, and his own notes of the March 11, 2022 meeting, five days before this email, record that he was "NOT CONCERNED w/ her work product because it is being technically reviewed." P. Ex. R, OAG2833. UNCONTROVERTED that Price sent the March 16, 2022 email and that Knox agreed with it.

**73-75. CONTROVERTED IN PART.** UNCONTROVERTED that Broil sent the email and that Knox so testified. CONTROVERTED as incomplete and as quoted, as to what Knox "construed," which rests solely on her declaration, D. Ex. C ¶ 46, and as to accuracy. The email was about searching cases in LIMS, a system KBI had no training for, P. Ex. K, Henderson 30(b)(6) Dep. 78:1-11, 79:7-10; the omitted sentences say Broil "sat with Beth and looked at the search-for-evidence ... methods you discussed." D. Ex. 66, OAG1725. Henderson could identify no instance of Broil claiming to lack training she had received, D. Ex. 77, Henderson Dep. 48:9-13, and as KBI's designee agreed KBI "couldn't find a single actual issue that she actually demonstrated having as it relates to conducting any of these drug analyses." P. Ex. K, Henderson 30(b)(6) Dep. 107:15-20.

**79. CONTROVERTED IN PART.** UNCONTROVERTED that Broil was told on July 28, 2022 that she would be placed on a training plan. CONTROVERTED as to the reason, which is pretextual and for the jury. The "skip over a lotta stuff" remark was Riddle's, not Price's. D. Ex. 57 at 19:15-23. At deposition Price gave a different reason, "trouble with some of her case work analysis," and conceded it appears nowhere in the recorded meetings. D. Ex. 79, Price Dep. 54:23-55:10, 55:22-56:1. The only training Henderson could identify that Broil said she lacked was LIMS and Qualtrax. P. Ex. K, Henderson 30(b)(6) Dep. 77:8-16.

**80. CONTROVERTED IN PART.** UNCONTROVERTED that Riddle drafted the program. CONTROVERTED as to "his discretion." Knox told Riddle which items to keep ("I'm good with your list, minus the court observation ... and adding in the oral board component") and that she would "run everything by TL too." P. Ex. S, OAG5004. The cited testimony vests discretion in "the supervisor and/or technical leader." D. Ex. 77, Henderson Dep. 87:25-88:19.

**82. CONTROVERTED** that the program complied with QM-12, which rests solely on

Henderson's declaration. D. Ex. B ¶¶ 35-39. Henderson testified she did nothing to ensure the program complied with KBI's policies, that § 9.1 requires "an issue that exists" and training "that will address that specific issue demonstrated by the employee," D. Ex. 77, Henderson Dep. 61:9-14, 62:6-8, and, as KBI's designee, that KBI could not find a single issue in her drug analyses. *See* RDSF 73-75. UNCONTROVERTED that § 9 governs remedial training and § 6 experienced hires.

**83. CONTROVERTED IN PART.** CONTROVERTED that Broil reviewed or agreed to the plan. Riddle kept the plan in his hands while he presented it ("she's gonna initial that ... but I use it to talk"), walked her through the training she had previously requested ("'cause you specifically asked me about things like that," and "training in LIMS and Qualtrax"). D. Ex. 57 at 20:3-21, 30:20-22. Knox "went around and got everybody's initials," and "[w]e actually had this already." *Id.* at 20:3-11, 31:4-7. Broil did not have time to review it before initialing where they asked; the next business day she wrote, "[t]here was no way for me to read a title on the Retraining Form ... and understand completely what will be expected of me without reviewing the material," and that she was "confused about some of the task listed that I have passed competencies for and other task not listed that I have no training for." P. Ex. T, OAG4699. UNCONTROVERTED that the plan was presented on July 28, 2022 and that Broil initialed it.

**86-89. CONTROVERTED IN PART.** CONTROVERTED as to the methodology. No document sets a standard completion time for any module ("There's nothing that exists with that"), and Riddle called his draft dates "probably just a bunch of random dates that were thrown out just to have some dates in that field." D. Ex. 78, Riddle Dep. 69:19-70:14. The LIMS and Qualtrax modules were new; Broil "was the first one to go through" them. P. Ex. K, Henderson 30(b)(6) Dep. 78:19-79:2. UNCONTROVERTED that Riddle's declaration so states and that Broil told him she had not been trained in LIMS and Qualtrax.

**90. CONTROVERTED IN PART.** CONTROVERTED that she asked for it and that instrument maintenance was removed. The only evidence of a request is Knox's own September 13, 2022 email to Price. D. Ex. 9, OAG2151. In November, Knox wrote, "These are your assigned instruments. Please let me know if you have time to change the oil while still completing your training on schedule." D. Ex. 68, OAG2386. UNCONTROVERTED that Broil stopped receiving new cases.

**91. CONTROVERTED.** That testing out carried no "penalty based on the result" rests solely on Riddle's declaration. D. Ex. A ¶ 42. Broil wrote Knox at the time that she could not "skim or rush material of over 200 pages and an exam of only eight to 10 questions, of which I must score 90%," and that "[i]f I am not able to complete the Stimulant Module . . . you will evaluate me as unsatisfactory." D. Ex. 68, OAG2383; D. Ex. 81 at #44. Knox's reply did not tell her otherwise. D. Ex. 68, OAG2382. Asked why a chemist who believed a failed test would cost her job would take one unprepared, Riddle answered, "I don't know what she's thinking," and would take that risk himself only "[i]f I knew the subject material." D. Ex. 78, Riddle Dep. 135:4-23. The examinations tested material outside a chemist's daily practice, and the training materials themselves lacked what the questions required: Riddle does not have the quantitation formula memorized and does not use it, and Knox lent Broil her own college textbook because the answer was not in the materials. *Id.* at 117:3-18, 120:4-22, 121:4-8; D. Ex. 76, Knox Dep. 88:6-14; D. Ex. 13, OAG2393. Nine days before the program was announced, KBI drafted the 90-day special review that would judge it, with its one Unsatisfactory criterion already typed in: "Has not passed all program modules due on or before 10-17-2022." P. Ex. U, OAG6455-62. The result was in fact held against her: the 90-day review's Unsatisfactory attitude rating faults her for "claiming you were not provided all the information needed until after taking and not passing a test," D. Ex. 31,

OAG2225, and KBI's designee gave the "two unsatisfactory ratings" as a reason for her termination. P. Ex. K, Henderson 30(b)(6) Dep. 90:2-4. Riddle counts "the tests" against her yet could name only one she did not pass, the LIMS test given before she had the materials. D. Ex. 78, Riddle Dep. 134:24-136:1, 137:2-7. The cited exhibit says Broil "did not attempt" to test out; it does not say she "refused." D. Ex. 81 at #47. UNCONTROVERTED that Broil did not attempt to test out of any module.

**93. CONTROVERTED IN PART.** CONTROVERTED as to the reason for the special review, which is pretextual. CONTROVERTED that Kansas managers "are trained in the use of special reviews" and that KBI applied the process "voluntarily" here. The only support is McAferty's declaration attaching a free online course and a workbook; McAferty did not work at KBI while Broil did. D. Ex. D ¶¶ 2, 24, 26. That workbook teaches the special review alongside "Documenting Incidents" and "Progressive Discipline." D. Ex. 36, OAG8176-77. Knox had never placed anyone else on a special. D. Ex. 76, Knox Dep. 83:15-18. UNCONTROVERTED that Broil was told she would be placed on a 90-day special review.

**97. CONTROVERTED IN PART.** CONTROVERTED as incomplete. Module 1 was due August 8, 2022; the day after, the QA Manager confirmed no LAM user guide existed and wrote, "I don't know how we can use/grade this as it stands." P. Ex. V, OAG4621-22; P. Ex. W, OAG4606-07. Broil was not given the LIMS and LAM user guides or a demonstration, D. Ex. 70, OAG2267, 2269, and Price confirmed on August 25 that she "was not given all of the necessary information for the LIMS assignment until she had already taken the test over the material." P. Ex. X, OAG6175. UNCONTROVERTED as to the completion dates.

**100. CONTROVERTED IN PART.** CONTROVERTED as to "refused," which rests on Riddle's declaration and his note reading "flat out refused?" with a question mark. D. Ex. 8,

OAG3265; D. Ex. A ¶ 26. The next day Riddle wrote: "After our discussion and your Scotts Test demonstration, I think that is now solved." P. Ex. Y, OAG5349. UNCONTROVERTED that the discussion occurred and that Broil correctly demonstrated the test.

**103, 105, 113-116. CONTROVERTED IN PART.** CONTROVERTED as to "regularly," "at the last minute," "spoon feed," "shortcuts," "would not ask meaningful questions," what a forensic chemist should know or find unaided, and what Riddle "understood" the November 8 email to mean, all of these characterizations rest solely on Riddle's declaration and are for the jury. D. Ex. A ¶¶ 31, 48, 50-53; D. Ex. 78, Riddle Dep. 137. Riddle testified that answering a trainee's questions is "the whole point of training," D. Ex. 78, Riddle Dep. 73:15-19, yet his own log records questions emailed the afternoon of August 16, 2022 and his answers sent "after 10PM" the next night, D. Ex. 8, OAG3264; Broil alone had to "bring a solution & why before Chris answers," P. Ex. Z, OAG6548; and Royel was told to route her questions to Knox and Riddle "for documentation purposes," an instruction Royel never received for any other trainee. P. Ex. AA, Royel Dep. 48:5-22. The question Riddle calls "spoon feed[ing]" was a request for a formula that Riddle testified he neither has memorized nor uses, D. Ex. 78, Riddle Dep. 120:4-22; Knox lent Broil her college textbook to find it. D. Ex. 13, OAG2393. UNCONTROVERTED that Broil sent Riddle questions by email, that she asked for the formula, that she sent the November 8, 2022 email, and that Riddle's emails say what is quoted.

**108. CONTROVERTED IN PART.** UNCONTROVERTED that D. Ex. 31 states these reasons. CONTROVERTED as to their accuracy and as to motive; the stated reasons are pretextual. The same review records "[c]ommunication has been taking place with your trainer and supervisor on a daily basis, both in person and in writing," D. Ex. 31, OAG2225, and Price acknowledged three weeks in that Broil "was not given all of the necessary information for the

LIMS assignment until she had already taken the test." P. Ex. X, OAG6175.

**110. CONTROVERTED IN PART.** CONTROVERTED as to "agreed." The line Broil initialed is captioned "acceptance," D. Ex. 12, OAG2236, and the review form she signed that week states a signature "does not imply agreement or disagreement." D. Ex. 30, OAG2263. UNCONTROVERTED that Broil initialed it on October 27, 2022.

**117. CONTROVERTED IN PART.** CONTROVERTED as to the rating's stated basis, which is pretextual, and as incomplete. Broil asked for the GC training module on November 7, 2022 and Riddle sent it on November 17. P. Ex. AB, DCB-P734-35. UNCONTROVERTED that the two modules were not completed within the 30-day period and that Broil received the rating.

**118. CONTROVERTED IN PART.** CONTROVERTED as to "issues regarding Plaintiff's attitude." Riddle, who with Knox "made" both special reviews, D. Ex. 82, Interrog. No. 4, testified that he had no complaints about her personality, demeanor, or interactions, that "[t]he *only* thing I dealt with was just technical issues," and that no one brought him any. D. Ex. 78, Riddle Dep. 75:17-76:10 (emphasis added). Before Broil complained, Knox rated her attitude "Exceeds Expectations." *See* PSOF 72. CONTROVERTED as to "continued to delay asking questions" and "refused to ask questions in-person," which rest on Knox's declaration and the review she and Riddle wrote, and as to motive; the stated reasons are pretextual. D. Ex. C ¶ 59. Price had told her, "I understand you want something to refer to. . . . So in writing it's fantastic," D. Ex. 1 at 4:5-7, yet Knox reported her preference for written comments as a sign she "may be trying to hide her lack of knowledge." D. Ex. 10, OAG2153. *See* RDSF 103, 105, 113-116, 108, 117. UNCONTROVERTED that D. Ex. 33 contains these statements.

**119. CONTROVERTED IN PART.** CONTROVERTED as to "indecisive" and as to Broil choosing the oil change over her training. Knox's email left the decision to Knox ("If not, I will

assign it to someone else"), Broil asked her to make it, and Knox reassigned the task; nothing in D. Ex. 68 shows Broil did an oil change. D. Ex. 68, OAG2382-86. UNCONTROVERTED that the emails were exchanged and the task reassigned.

**123. CONTROVERTED IN PART.** UNCONTROVERTED that Knox told Broil on August 15, 2022 that she was not approved to attend. CONTROVERTED as to the reason, a state of mind and pretextual. Knox's own account records Broil saying she "wasn't provided the materials in time to get the first two modules completed on time," D. Ex. 71, OAG1756; P. Ex. X, OAG6175 (Price confirms).

**128. CONTROVERTED IN PART.** UNCONTROVERTED that Broil was terminated on December 5, 2022 and that the letter gives that reason. CONTROVERTED as to the reason itself, which is pretextual and for the jury. Both special reviews were "made by Christa Knox and Chris Riddle," D. Ex. 82, Interrog. No. 4; Riddle set the target dates they graded her against and called them "probably just a bunch of random dates that were thrown out," D. Ex. 78, Riddle Dep. 70:10-14, and target completion dates are not requirements for any employee. P. Ex. K, Henderson 30(b)(6) Dep. 93:1-5. Worley, who designed her initial training, testified that target dates are "guidelines," and "you don't get real excited if you don't hit those dates." P. Ex. Q, Worley Dep. 109:19-21. *See* RDSF 86-89, 118. Thompson asked no question to make sure the termination was not retaliatory: "The short answer was no." P. Ex. AD, Thompson Dep. 37:21-38:6. In twenty-five years the only other chemist KBI terminated was terminated after his arrest. P. Ex. AE, McAferty 30(b)(6) Dep. 50:15-18, 53:13-20.

**130. CONTROVERTED IN PART.** UNCONTROVERTED that Thompson signed the termination letter and that Price recommended termination. CONTROVERTED as to Henderson's "lack of confidence," which appears only in her July 2026 declaration, D. Ex. B ¶ 6; asked what

role she played in the decision, she testified, "I didn't." D. Ex. 77, Henderson Dep. 58:16-22. CONTROVERTED that Thompson's decision was an independent one, and as to motive, which is pretextual: KBI states he "had only indirect knowledge" of the matters it was based on, D. Ex. 82, Interrog. No. 14, and he took his managers at their word: "Yes. I mean that's the way things work. You trust the people." P. Ex. AD, Thompson Dep. 40:4-10.

**133. CONTROVERTED IN PART.** UNCONTROVERTED that this is what Schieferecke testified. CONTROVERTED as to accuracy and shifting position. The week it happened Knox reported Schieferecke "does not remember that conversation from a couple weeks ago at all" and that Bailey said it "sounds like something Jim would say," D. Ex. 69, OAG1744; at deposition he recounted what he said. D. Ex. 80, Schieferecke Dep. 70:13-16, 72:5-6.

**135. CONTROVERTED** as to "admonished." Knox: "I did not discipline him other than to let him know in the conversation that it was unacceptable behavior." D. Ex. 76, Knox Dep. 42:4-10. Schieferecke has never been counseled, written up, or disciplined at KBI, or sent to training on dealing with co-workers. D. Ex. 80, Schieferecke Dep. 28:10-13, 28:21-29:4.

**137. CONTROVERTED IN PART.** UNCONTROVERTED that the November 30, 2021 meeting occurred and that Henderson's notes say this. CONTROVERTED as to "were advised," if offered for its truth: the only source is Henderson's note of what Knox "relayed," D. Ex. 46, OAG36. Schieferecke testified he has never been counseled or written up and did not remember anyone in management speaking to him about Broil. D. Ex. 80, Schieferecke Dep. 28:21-29:4, 72:15-19, 73:17-20. Broil replied the next day, "I await the Productive Work Environment Form." D. Ex. 46, OAG36.

**140. CONTROVERTED IN PART.** CONTROVERTED as to "attempted to kick him off" and as to any "determination" that Broil acted inappropriately. Until Henderson's July 2026 declaration

("[i]n my judgment"), the only person who claimed Broil acted inappropriately was Schieferecke himself. D. Ex. B ¶¶ 22-23; D. Ex. 80, Schieferecke Dep. 29:25-30:2; D. Ex. 44, OAG1731 ("Jim perceiving DC to be ordering him off an instrument"); D. Ex. 77, Henderson Dep. 73:13-18, 78:4-12; D. Ex. 82, Interrog. No. 8. Broil testified: "No, I did not. Jim threatened to me that I'd better not ask him to get off the instrument." P. Ex. AF, Broil Dep. 173:9-13. Knox's own email that week reported that "Jim raised his voice to the point that people in the wet lab and hallway could hear him" and that she told him "yelling is not appropriate." D. Ex. 44, OAG1731. Schieferecke denies he yelled: "[t]heir version of yelling and my version of yelling are probably two different things." D. Ex. 80, Schieferecke Dep. 41:15-42:2. UNCONTROVERTED that there was a dispute over a shared instrument and that Schieferecke raised his voice.

**143. CONTROVERTED IN PART.** UNCONTROVERTED that the form was submitted June 13, 2022 and Broil wrote, "I don't have current harassment and discrimination to report for 2022." CONTROVERTED that she had nothing current to report. On the same form she answered "Yes" to "Do you have claims of harassment, discrimination or retaliation to report?", reported five incidents, described her work environment as one that "was and is still hostile and tense," and wrote, "I am afraid of his next attack." D. Ex. 24, OAG2074-75. Her sentence referred to new discriminatory harassment by Schieferecke, not retaliation; her Rule 30(e) errata, served April 23, 2026 by agreement, states that she "was not saying that I did not have new retaliation or retaliatory harassment to report." P. Ex. AF, Broil Dep. Errata Nos. 7-8; *id.*, Apr. 6, 2026 Shoger email.

**145. CONTROVERTED** as to accuracy. Price could not name either examiner or say when, placed both in the firearms section, said both were terminated, then that one was, and was "not 100 percent sure" which. D. Ex. 79, Price Dep. 58:3-10, 60:11-13, 62:17-63:12. No chemistry scientist has ever been placed on remedial training after completing new-employee training. P. Ex. K,

Henderson 30(b)(6) Dep. 69:5-15.

**146. CONTROVERTED.** Price answered, "Yes, I believe we have done that," followed by "I do not have direct knowledge of that" and no "specific recollection of any prior instances." D. Ex. 79, Price Dep. 97:8-22. No one but Broil has been required to take the "Dealing With Difficult People" class. D. Ex. 76, Knox Dep. 65:9-20.

## III. PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

### A. Plaintiff was hired as an experienced chemist and completed the individualized program designed for her.

**1.** KBI admitted Broil was an "experienced forensic chemist" at the time of hiring her, and T.L. Price said she was a "wealth of knowledge and had a ton of experience…" P. Ex. F, RFA No. 12; D. Ex. 79, Price Dep. 110:17-111:2.

**2.** Broil came to KBI with more than 12 years of experience as a forensic chemist and "700 + trials." P. Ex. AH, OAG3051-52. Worley, who hired her, agreed that it was "very significant experience," P. Ex. Q, Worley Dep. 99:1-100:1, and Price agreed that she had performed analysis in narcotics, alcohol, and drug cases "for many years." D. Ex. 79, Price Dep. 73:13-17.

**3.** Broil completed every substantive module and was working cases long before October 13, 2020: she was released to work controlled substances on October 11, 2019; her authorization was expanded on January 8, 2020 ("updated WA to include Marijuana/THCs and microscopes"); she was fully released for casework in March 2020; and her authorization was expanded again on October 20, 2020 ("updated WA to include LCUVMS"). *See* D. Exs. 4, 59; P. Ex. AI, OAG1870-78 (10/11/2019); P. Ex. AJ, OAG2056-57 (1/8/2020); P. Ex. AK, OAG2015-16 (10/20/2020).

**4.** The Completion of Training Approval block on Broil's Training Program Initiation Form is signed by all four required roles: the trainer, supervisor Knox (10/16/20), Technical Leader Riddle (10/16/20), and the QA Manager (10/20/2020). P. Ex. AM, OAG2028-29.

**5.** Broil completed her individualized training plan and was never told she failed it; Worley, who designed it, testified that she did not fail any module, so § 6.6 was never triggered. P. Ex. K, Henderson 30(b)(6) Dep. 86:18-21, 88:4-6; P. Ex. Q, Worley Dep. 27:11-19, 117:21-118:25.

**6.** Price testified that no one ever told him Broil failed to complete her initial training, that she held work authorizations, and that KBI requires completion of the initial training program before an employee receives them. D. Ex. 79, Price Dep. 78:16-79:13.

**B. Plaintiff complained of race and sex discrimination in writing and every decisionmaker knew.**

**7.** On November 10, 2021, Broil met with Knox and made a complaint of race discrimination and sex discrimination against Schieferecke, which Knox admitted to. P. Ex. AO, OAG1733-34; D. Ex. 45, OAG1735-37; D. Ex. 76, Knox Dep. 48:13-25.

**8.** Broil told Knox that Schieferecke had approached her and made a joke about a "negro virus" being created, then told Bianca, and they both laughed. P. Ex. AO, OAG1733-34. Broil heard Schieferecke say "Negro virus" "over and over," "[a]t least five times, if not seven." P. Ex. AF, Broil Dep. 124:4-14.

**9.** Broil also told Knox that Schieferecke had shown her an inappropriate video of a man masturbating, which she had reported before to Henderson. D. Ex. 45, OAG1735-37.

**9A.** On June 8, 2021, Broil met with HR to report her hostile work environment. In KBI's own Productive Workplace Environment form she wrote that she "was told that no complaint will be taken and no file has or will be made/kept," and that HR "would give me the Productive Workplace Environment form when it was ready." D. Ex. 24, OAG2075. She never received the form. P. Ex. AF, Broil Dep. 53:25-54:7.

**10.** Knox admitted that Broil's complaints were complaints of racial discrimination and sexual harassment, and that the conduct reported, if it occurred, would violate KBI policy. *See* D. Ex. 76, Knox Dep. 41:2-15, 48:13-25.

**10A**. Knox was not aware of any investigation of Broil's sexual harassment complaint. D. Ex. 76, Knox Dep. 47:25-48:3.

**10B.** Price testified that a male employee giving a female coworker a DVD with a masturbation scene at work would violate KBI policy. D. Ex. 79, Price Dep. 93:16-94:9.

**10C.** Price testified that telling an African American employee, "there was a new Wuhan negro virus that caused limbs to rot off" at work would "[a]bsolutely" violate KBI policy, and that the comment "would be inappropriate, absolutely." D. Ex. 79, Price Dep. 94:10-19, 95:3-5.

**11.** During a dispute over a shared instrument, Schieferecke told Broil he was "not going to help you anymore unless I'm ordered to." D. Ex. 80, Schieferecke Dep. 45:3-16. Broil did not ask him to get off the instrument: "Jim threatened to me that I'd better not ask him to get off the instrument." He then yelled at her, and she left. P. Ex. AF, Broil Dep. 173:9-23.

**12.** Royel also testified that Schieferecke yells, has even yelled at her, and was disrespectful. P. Ex. AA, Royel Dep. 63:3-16. Royel had also reported Schieferecke's yelling to Knox in writing on May 17, 2021: "people shouldn't be getting yelled at by their coworkers." P. Ex. AP, OAG10381.

**12A.** Royel testified that Schieferecke referred to Broil as "a black bitch and a nigger." P. Ex. AA, Royel Dep. 64:18-65:5. No one from HR, management, or anywhere else at KBI ever asked Royel whether Schieferecke had said or done anything racially offensive. *Id.* 65:12-66:4. KBI admits that making racially offensive comments, using that word at work, calling a colleague that

word, and calling a colleague "Black Bi*ch" each violate its policies. P. Ex. F, RFA Nos. 36-39. Royel never heard Broil yell at anyone. P. Ex. AA, Royel Dep. 62:16-23.

**12B.** Knox testified that Schieferecke yelled or raised his voice at her, his own supervisor, "a few" times, that it was inappropriate and disrespectful, and that "I believe he's raised his voice at meetings." D. Ex. 76, Knox Dep. 52:3-15, 60:1-5, 60:23-61:2. She "coached" him and has never assigned him Fred Pryor training: "I just haven't." *Id.* 52:16-19, 61:3-13.

**C. Defendant's actions after Plaintiff's complaints of discrimination.**

**13.** Fourteen minutes after the complaint reached her, Henderson wrote to Knox: "While I do feel the issue in the lab needs to be addressed by management. There are additional issues that will have to be addressed by [Broil]." D. Ex. 45, OAG1735-37.

**14.** On December 10, 2021, one month after Broil's complaints of race and sex discrimination, Henderson sought permission to record conversations with her because "[Broil] has brought forth a number of complaints," something she had never sought for any other employee. D. Ex. 47, OAG38-39; D. Ex. 77, Henderson Dep. 67:6-9. The same day Associate Director Hutchings wrote, "Mary believes we may be in a pre-litigation posture with her." D. Ex. 47, OAG38.

**D. After Plaintiff's complaints, Defendant investigated Plaintiff instead.**

**15.** During the annual review meeting on December 21, 2021, forty-one (41) days after Broil's complaint, Knox informed her about taking the Fred Pryor training. D. Ex. 28; D. Ex. 50, OAG1824-25.

**16.** KBI admits that Broil "was required to attend Fred Pryor seminars" and "participated in compulsory Fred Pryor training," and that Schieferecke "was never required to attend Fred Pryor seminars" and "was not required to complete compulsory Fred Pryor training." P. Ex. F, RFA Nos. 31, 32, 62, 63.

**17.** Beginning December 30, 2021, seven weeks after Broil's November 10, 2021 complaint, Knox kept a running log titled "Personnel & QA Issues DCB" on Broil. P. Ex. AQ, OAG6501-06. Knox instructed Royel to document for her any mistake Broil made in her reports, had no reason to disagree with Royel's testimony that Broil was the only employee Knox ever instructed her to document, and did not believe she had instructed any employee to document another employee's mistakes other than Broil's. D. Ex. 76, Knox Dep. 89:12-24, 90:15-18.

**18.** On January 19, 2022, Knox's written responses to Broil's review questions described Broil as "defensive" and "not forthcoming with all the information in incidents that occurred with Jim Schieferecke," the incidents Broil had reported as race discrimination and sexual harassment on November 10, 2021. D. Ex. 28; D. Ex. 50, OAG1819-20.

**19.** After Broil's complaint of discrimination, Riddle went looking for concerns about Broil: on March 8, 2022, he asked Beth Royel, Alyssa Weeks, and Jana Gannaway for "any tech review concerns" regarding Broil. D. Ex. 78, Riddle Dep. 53:18-23; D. Ex. 6, OAG1666; P. Ex. AR, OAG4652-53.

**20.** Each answered with praise. Royel: "[s]he has improved tremendously (getting initials when needed, descriptions and what was/wasn't analyzed, and sticking to her guns when she disagrees with the peer reviewer). Her notes, data, etc. are easy to read, neat and very organized. I have nothing negative to say as there are no quality issues that should be of concern." P. Ex. AR, OAG4652; D. Ex. 78, Riddle Dep. 55:4-17. Weeks called Broil "a wonderful person" who is "very eager" to learn and wrote that she still makes clerical errors herself and has "seen many in other chemists reports/notes as well." D. Ex. 6, OAG1665. Gannaway "didn't see anything out of the usual." P. Ex. AR, OAG4653; D. Ex. 78, Riddle Dep. 147:3-12.

**21.** Omitted.

**22.** Riddle testified that he received "a lot of e-mails" of "concerns" about Broil from other chemists, and that Royel "had previously been one of the chemists that had sent concerns to me." Asked how many, he answered, "even one or two would have been a lot," and he could not say when any were sent: "I don't know what the time frame was." D. Ex. 78, Riddle Dep. 55:18-56:7, 56:18-24, 76:23-77:7.

**23.** Asked under oath to identify every "formal or informal complaints, write-ups, counseling or disciplinary action of any kind" related to Broil's work performance, KBI listed counselings, the Fred Pryor classes, and the two special reviews, and no complaint from any chemist. D. Ex. 82, Interrog. No. 4. Knox could not say when Riddle or Royel raised concerns and did not "remember documenting initially." D. Ex. 76, Knox Dep. 111:15-114:13.

**24.** Omitted.

**25.** Worley, who supervised Broil's initial training, rated her Attitude and Accountability "Exceeds expectations" in her November 2019 probationary review, testified that she was "very receptive" to suggestions and "always positive," and recalled no issues with her attitude or her colleagues. P. Ex. Q, Worley Dep. 67:13-14, 74:11-75:23, 79:9-10.

**26.** Three days later, at the March 11, 2022 meeting with Price and Knox, Riddle stated that Broil "likes to 'play the victim card'… no accountability." On the same page of his notes, Price recorded that he was "NOT CONCERNED w/ her work product because it is being technically reviewed ... as long as mistakes are caught," and directed the chain to "recommend documenting and T.R. issues and revisit in 30 days." P. Ex. R, OAG2833.

**27.** Riddle was not Broil's supervisor. As the chemistry technical leader he was "in charge of the methodologies and the protocols," and he worked in the Great Bend laboratory until about the fall of 2021. D. Ex. 78, Riddle Dep. 11:2-8, 12:1-13:3, 15:4-10, 76:15-19.

**28.** On March 15, 2022, Knox put together Broil's training portfolio to be scrutinized and sent it to Price; she was never asked to do that for any other employee. D. Ex. 59, OAG1050-51; D. Ex. 76, Knox Dep. 122:7-12, 123:9-12.

**29.** On March 16, 2022, Laboratory Director Price told Knox to "proceed with… monitoring [Broil's] work through technical review and documenting anything that is not meeting our standards." D. Ex. 59, OAG1050.

**30.** On May 9, 2022, Price met with Knox and Riddle and, per his notes of May 9 to 10, directed them to "CONTACT HR AND PROCEED W/ A SPECIAL EVALUATION ~90 days … monitor @ least every 30 days." The grounds in his notes are that Broil was "late to the 'huddle' mtgs," "isolates from group," and had "time reporting issues ... most recently w/ jury duty time" (the timesheet Knox had approved, PSOF 33); the notes say nothing about the quality of her casework. P. Ex. AS, OAG2830. KBI's management notes for May 10 and 11 record "Christa will talk to HR about a special" and "DC - planning to implement a special." P. Ex. AT, OAG6644-52.

**E. Defendant excused employees' mistakes except for Plaintiff's mistakes.**

**31.** Riddle wrote to Broil on March 16, 2021, about the amended report process: "We have all had to do amended reports." P. Ex. AV, OAG4648.

**32.** In June 2021, Porubsky reported a misspelled chemical name in a Broil report. Riddle answered, "it was decided that it did not warrant an amended report at this time," and that KBI would act differently only "if we discovered this to be a 'systemic error.'" P. Ex. AW, OAG4638.

**33.** From April 4 through April 13, 2022, Broil served on a jury in the Circuit Court of Jackson County, Missouri. On the morning of April 18, 2022, Knox accused Broil in writing, to Broil and HR, of falsifying her timesheet for jury service: "This is falsification of your timesheet." P. Ex. AX, DCB-P44; P. Ex. AY, DCB-P45-46. Knox approved the timesheet within three hours, after

the judge confirmed the hours ("The email from the judge should suffice"), yet forwarded the exchange to Director Price ("I have some concerns"; "still a bit uneasy") and logged the episode as "Potential falsification of timesheet issue." P. Ex. AZ, DCB-P54; P. Ex. BA, OAG6513-19; P. Ex. AQ, OAG6503.

### F. On the day KBI imposed the retraining, its own review rated her meeting and exceeding expectations.

**34.** KBI admits that "[i]n all of Plaintiff's Annual Reviews during her employment, Plaintiff's overall performance rating was, 'Meets Expectations.'" P. Ex. F, RFA No. 27.

**35.** On July 5, 2022, before the retraining meeting, Riddle notified Broil of her "successful completion of your annual drug proficiency (CTS-5001)" and wrote: "Good job! You make me proud to work alongside of you." P. Ex. BB, OAG5134-35.

**36.** The mid-year review signed on July 28, 2022, the same day the retraining and the 90-day special were imposed, states: "You have done a great job in focusing on casework to ensure you are meeting your casework and review goals. You have authored an average of 27.3 reports per month (meeting expectations) and reviewed an average of 31.9 reports per month (exceeding expectations)." D. Ex. 29, OAG2258; P. Ex. F, RFA Nos. 25, 26.

**37.** Shown the July 28, 2022 mid-year review at deposition, Price agreed that it refreshed his recollection that Broil "was in fact meeting or exceeding expectations as it relates to her case work when she was put on the retraining program": "Yes, it appears it does." Asked whether the review's paragraph on quality issues was why she was placed on the retraining program, he answered, "No. I'm simply reading what you handed me." D. Ex. 79, Price Dep. 52:4-53:15, 54:10-17.

**38.** HR's own handwritten notes of that meeting record: "Meet casework goal - EXCEEDING expectations - reports per month." P. Ex. BC, OAG3245-47.

### G. The retraining program violated Defendant's own policy and addressed no identified deficiencies

**39.** QM-12 § 6.6 requires the full basic program only upon "[f]ailure to successfully complete the individualized training plan"; § 9.2 confines "the prescribed basic training" to "any analyst entering a new discipline or sub-discipline"; and § 9.1 provides that "[r]emedial training programs will be developed by the supervisor and/or technical leader, based on the circumstances requiring the remedial training." D. Ex. 55, OAG3205-07; D. Ex. 77, Henderson Dep. 61:9-14.

**40.** Those three provisions are word-for-word identical across every issued revision of QM-12 from Revision 5 (3/27/2019) through Revision 11 (6/21/2024). Revision 7, which took effect May 24, 2022, eight days after KBI's stamped receipt of the charge, changed nothing in §§ 1 through 12. From Revision 12, KBI's own drafters separate the two categories in terms: § 10.1.2 for a trainee who fails an individualized program, § 10.2 for "when a previously trained and authorized analyst requires remedial training." P. Ex. BD, OAG8631-94; P. Ex. BD, OAG8648-56; P. Ex. BE, OAG8695-8727.

**41.** No circumstances existed for the drug modules. KBI's Rule 30(b)(6) designee could not point to an error in Broil's cocaine analysis anywhere in the record and agreed that "we couldn't find a single actual issue that she actually demonstrated having as it relates to conducting any of these drug analyses." P. Ex. K, Henderson 30(b)(6) Dep. 84:7-13, 107:15-20.

**42.** Riddle admitted that Broil had no issues conducting analysis of cocaine, stimulants, hallucinogens, depressants, opiates, steroids, or any designer drugs, and that no policy required her to undergo the training of a new forensic chemist given her experience. D. Ex. 78, Riddle Dep. 30:17-21, 129:15-131:21.

**43.** Henderson admitted that it would be inappropriate to place someone in a training program for no reason. D. Ex. 77, Henderson Dep. 90:16-23.

**44.** Director T.L. Price, chemistry supervisor Christa Knox, chemistry tech lead Chris Riddle, and HR decided to place Broil on a remedial retraining that began in August 2022. P. Ex. K, Henderson 30(b)(6) Dep. 75:20-76:9.

**44A.** Broil testified that the July 28, 2022 meeting was "the scariest meeting": "I was scared to death," "I just knew they were trying to get rid of me and I wanted them to please work with me," and "I was terrified and I felt like they were setting me up for failure." When she tried to tell them the program would not work in her favor, "it was rejected and I felt punished." P. Ex. AF, Broil Dep. 142:20-25, 143:6-7, 143:17-20, 144:21-24. Told she must be retrained on analyses she had performed "hundreds of times," she "was so afraid." *Id.* 145:13-146:11.

**45.** Asked whom she recalled discussing Broil's charges of discrimination with, Knox testified: "I believe Chris Riddle and I talked about it." She did not "specifically remember" what they discussed. D. Ex. 76, Knox Dep. 108:13-21.

**46.** Riddle testified that he did not become aware that Broil had made any complaint at work until after she had left, and that he heard nothing from Knox "until after she left." D. Ex. 78, Riddle Dep. 88:11-20.

**47.** KBI's interrogatory answers state that the decisions to place Broil on the 90-day and 30-day special reviews were "made by Christa Knox and Chris Riddle." D. Ex. 82, Interrog. No. 4. Knox testified that "Chris and I made the decision that she should at least go over these training modules." D. Ex. 76, Knox Dep. 138:24-139:4.

**48.** From June 17 to June 20, 2022, Knox and Riddle exchanged several emails in which Knox told Riddle what topics and/or modules to include in Broil's retraining. P. Ex. S, OAG5004-05.

**49.** Riddle could not impose the program on his own: "A supervisor would have to be included in that." Asked who instructed him to begin designing it, he answered, "My guess would be

Christa," and asked who approved it, "I approved it. Christa approved it." D. Ex. 78, Riddle Dep. 29:2-18, 30:22-31:8. Knox testified that the decision "came from myself and the tech lead at the time, Chris Riddle," and that HR did not have to approve "[t]he training program itself." D. Ex. 76, Knox Dep. 81:9-12, 151:23-152:8.

**50.** On June 27, 2022, five weeks before it was imposed, KBI's management notes record: "We haven't trained her well enough the first time," "Do not put her on the special – pure #'s don't support it," and "TL [Price] does not support the special at this point." P. Ex. BF, OAG6586.

**51.** On July 19, 2022, nine days before the July 28 meeting, KBI drafted together the Training Program Initiation Form for Broil's retraining and the 90-day special review form that would judge it, labeled by hand "TL's drafts from 7/19/22 meeting." The draft review already defined the only way to fail: "Unsat – Has not passed all program modules due on or before 10-17-2022 (less than 7 modules)." P. Ex. U, OAG6455-62.

**52.** By the program's own target dates, the LIMS and Qualtrax modules were allotted one week each, while the modules covering spot tests and the seven controlled-substance classes on which Broil already held work authorizations (cocaine, stimulants, hallucinogens, depressants, opiates, steroids, designer drugs), together with sampling, miscellaneous topics, and the oral board, were allotted twenty-one of the twenty-eight weeks. P. Ex. U, OAG6455-62; D. Ex. 60, OAG1056-57.

**53.** The LIMS and Qualtrax modules were in no one's training. KBI's Rule 30(b)(6) designee testified that KBI's training program at the time "did not include LIMS training or Qualtrax training," that "[t]here wasn't a separate training for LIMS," and that "[w]hat we recognize is that was evidently not sufficient, so we then built training for her"; Broil's possible non-conformities related to LIMS, and she was able to address them "once she was taught or shown how to appropriately use LIMS." P. Ex. K, Henderson 30(b)(6) Dep. 52:13-18, 77:8-24, 78:1-11, 79:3-10.

**54.** Riddle could not recall what comparable training modules he reviewed to set a completion time and admitted that in his draft of the retraining he put "just a bunch of random dates that were thrown out just to have some dates…" D. Ex. 78, Riddle Dep. 70:3-6, 70:7-14.

**55.** On June 30, 2022, while the retraining modules were being drafted, Knox wrote of the target dates: "I just threw in the 18th so we had something to work with," and "The modules are definitely still in draft form." P. Ex. BG, OAG3519; P. Ex. BH, OAG3520-21; P. Ex. BI, OAG3970-72.

**56.** KBI admitted that during new-employee forensic chemist training, "most of the time an employee's target completion date is two weeks or more per module," and that target dates of three weeks and of four weeks for one module occur. P. Ex. F, RFA Nos. 65, 66, 67. Broil's first module was assigned a target of one week, August 1 to August 8, 2022. D. Ex. 11.

**57.** Broil received less time to complete the modules: for designer drugs she received one week, from 12/05/22 to 12/12/22, while everyone else received "2 weeks from completion of 4.06." *See* D. Ex. 82, Interrog. No. 24; D. Ex. 11.

**58.** On the first day of the program KBI removed the twenty-three cases and 472 items Broil was carrying, P. Ex. BJ, OAG6555-65, and once the program began, KBI told Broil she was not to work cases: its own QA record of August 10, 2022, states she "w[as] told casework is not a priority," and Knox wrote on September 13, 2022 that there was no "expectation for her to do any at this time." P. Ex. BK, OAG4881-82; D. Ex. 9, OAG2151.

**59.** The materials the program tested did not exist when its deadlines began running. On June 30, 2022, the QA Manager asked whether answer keys or grading criteria existed; there were none. P. Ex. BL, OAG4798-99. On August 9, 2022, the day after module 1 was due, she wrote: "Were any of the demonstrations provided? ... I don't know how we can use/grade this as it stands without

those or some equivalent occurring," and confirmed no LAM user guide existed. P. Ex. W, OAG4606-07; P. Ex. V, OAG4621-22.

**60.** On August 25, 2022, Price confirmed the problem in writing: "She wanted me to know that she was not given all of the necessary information for the LIMS assignment until she had already taken the test over the material ... Please make sure we provide her with all of the materials in the expected modules when they are assigned." P. Ex. X, OAG6175. Price was unaware the first module's materials had not all been provided until after the August 8 deadline passed and agreed it would have been important for him to know. D. Ex. 79, Price Dep. 103:6-18.

**61.** While Broil was going through the remedial training, Knox and Riddle ordered Royel not to answer any of her questions and to direct her to them for documentation purposes, although Royel understands that answering questions when others are going through training is every forensic scientist's responsibility. P. Ex. AA, Royel Dep. 48:1-17.

**62.** On November 14, 2022, when Broil asked Riddle which references to use for a Stimulants module question, Riddle, copying Knox, answered: "In the past, trainees have had success searching through drug websites. After a quick search I found this: Erowid Methamphetamines Vault: FAQ." P. Ex. BM, DCB-P232. Riddle testified that the site is "a message board," that "[i]t's not exactly scientific if it's a drug site posting," and that it is "a druggy website." D. Ex. 78, Riddle Dep. 115:15-116:4, 116:16-23.

**63.** The modified target dates Riddle set on October 27, 2022, Stimulants by November 9 and Hallucinogens by November 23, were the two modules Broil was required to complete during the 30-day special review that ran October 27 to November 26, 2022. D. Ex. 12; D. Ex. 32.

**H. During the retraining, KBI sponsored Broil as its expert witness in Kansas criminal courts.**

**64.** KBI admitted Broil gave expert testimony on September 14, 2022 (*State v. McLean*) and October 25, 2022 (*State v. Waldron*), during the retraining program and inside the 90-day special review. P. Ex. F, RFA Nos. 21, 23; P. Ex. BN, DCB-P811. The subpoena for the September trial was issued July 28, 2022, the day of the retraining meeting, and was served August 5, 2022, five days after the program began. P. Ex. BO, DCB-P813.

**65.** Riddle, who designed the retraining, evaluated both appearances and rated her 4 of 5 each time. Of the September 14 testimony he wrote, "16 yrs experienced in drug analysis ... No concerns"; Knox, as supervisor, rated it "satisfactory" and noted that no nonconformities were identified. P. Ex. BP, OAG3184; P. Ex. BQ, OAG3185-86. P. Ex. BR, OAG3187.

**66.** Throughout the same period KBI certified her work to Kansas courts under K.S.A. 22-3437, over her name, stating that she had "completed the appropriate training protocols and proficiency tests." P. Ex. BS, OAG6207-08; P. Ex. BT, OAG6436-51.

**I. Termination was decided before the review period closed.**

**67.** On October 18, 2022, eleven days before the 90-day review period ended, Knox sent Riddle a closeout form for the review, already filled out with Task 1 marked "Unsat," writing, "Let me know what you think. I'm struggling with wording a bit." P. Ex. BU, OAG6134; P. Ex. BV, OAG6135-40.

**68.** No employee has ever been terminated for not completing training modules by the original deadlines, and trainees missing target dates "has happened several times." P. Ex. AA, Royel Dep. 50:14-24; D. Ex. 76, Knox Dep. 91:5-92:1.

**69.** KBI's Rule 30(b)(6) designee testified that target completion dates are not requirements for any employee: "Q. [T]arget completion does not mean that new employees or any employee

has to complete their training within this targeted time for each module, correct? A. Correct." P. Ex. K, Henderson 30(b)(6) Dep. 92:6-93:5.

**70.** Knox testified that a special performance review is "part of our disciplinary process," D. Ex. 76, Knox Dep. 106:10-15, and that she had never placed any employee on one before. *Id.* at 83:15-18. KBI's HR designee testified that a special "is often called a PIP." P. Ex. AE, McAferty 30(b)(6) Dep. 69:23-70:1.

**71.** Termination paperwork was prepared before the 30-day review period closed. KBI's notes record on November 15, 2022: "Termination Paperwork before Thanksgiving to Legal/HR • End of Employment paperwork prepared," a plan to "separate on Mon. after Thanksgiving," and a decision to withhold the discussion from Broil because it "would be distracting to DC and hinder her training." P. Ex. BF, OAG6566-95. On November 28, 2022: "Mary will read the dismissal letter." *Id.* She was terminated December 5, 2022.

**72.** The 30-day special review and the termination rest in part on "issues regarding Plaintiff's attitude." D. Ex. C ¶ 59; D. Ex. 33. Riddle, who ran the retraining through both special reviews, testified he had no complaints about Broil's personality, demeanor, or interactions, that "[t]he only thing I dealt with was just technical issues," and that no one brought him any issue about her interactions. D. Ex. 78, Riddle Dep. 75:17-76:10. Before Broil complained of discrimination, Knox rated her Attitude/Accountability "Exceeds Expectations" in the 2020 Review: "You always come to work with a positive attitude and take on tasks happily. This positivity rubs off on your co-workers as well." D. Ex. 26; D. Ex. 76, Knox Dep. 178:6-12, 181:21-182:12.

**73.** Director Thompson, who held final authority for hiring and firing, reviewed no documents before signing: "Q. So other than a verbal report, you don't recall reviewing any specific documents, correct? A. I do not." P. Ex. AD, Thompson Dep. 13:5-9, 45:7-10. He did not take the

further steps he recalled taking in other discrimination complaints, *id.* at 44:7-17, and asked no question to ensure the termination was not retaliatory: "The short answer was no." *Id.* at 38:1-5.

**74.** Asked whether he was aware, when he terminated her, that Broil had complained of discrimination and filed a charge of discrimination, Director Kirk Thompson, who signed the December 5, 2022 termination letter, testified: "I can't imagine that I was not aware at the time that I signed this letter terminating her employment." P. Ex. AD, Thompson Dep. 50:16-24.

**75.** KBI's sworn interrogatory answers identify the persons "having knowledge of any of the factual matters upon which the decision to terminate Plaintiff is claimed to have been based" as Knox and Riddle, who "had knowledge of Plaintiff's unsatisfactory work and training performance," and Price, who "had knowledge of his attempts to work with Plaintiff to improve her performance," and state that Director Thompson "had only indirect knowledge of the above matters." D. Ex. 82, Interrog. No. 14.

**76.** Price described his involvement in the termination as "[t]he review of all of the materials surrounding the package that was sent up," and recommended termination. D. Ex. 79, Price Dep. 51:22-52:3.

**77.** Thompson testified the termination "came to me as far as a kind of a verbal briefing," with "a draft letter" he "would then adopt it and sign it." P. Ex. AD, Thompson Dep. 44:23-45:6.

**78.** Price, who recommended Broil's termination, testified that he learned during her employment that she had filed a charge of discrimination with federal and state agencies, and that when an employee files a charge, human resources typically schedules a meeting with him to discuss it. D. Ex. 79, Price Dep. 47:15-20, 47:24-48:10, 52:1-3.

**J. Administrative exhaustion.**

**79.** Broil filed KHRC/EEOC charge 43751-22 (EEOC No. 28D-2022-00496) on May 5, 2022, and an amended charge on May 31, 2022; KBI's file copies bear its "Received MAY 16 2022" and "Received JUN 02 2022" stamps. D. Ex. 75, OAG2408-24; P. Ex. BW, OAG2460-63.

**80.** On February 8, 2023, Broil filed a second charge (EEOC No. 28D-2023-00374) alleging that KBI retaliated against her by imposing the retraining program and special reviews and by terminating her employment on December 5, 2022. D. Ex. 75, OAG2989-3001.

**81.** The EEOC issued right-to-sue letters on both charges dated October 24, 2023. Pretrial Order (Doc. 113), stip. v; P. Ex. BX, OAG3048-50. On January 22, 2024, Broil filed this action within ninety days of those letters. Doc. 1.

**82.** After terminating Broil, KBI continued to forward to her subpoenas issued by prosecutors for her testimony, and by its own practice pays former employees, at the rate they were receiving when they separated, "for testifying regarding work performed while they were employed at the KBI," providing them their case file materials to prepare. P. Ex. BY, OAG2809-11.

**K. Defendant treated the male trainer's own retraining, and every other chemist's, differently.**

**83.** Riddle's own retraining, imposed after an audit found actual misconduct in evidence marking, covered one topic, lasted about a month, and he agreed it was "narrowly tailored to the issues you'd actually had": "Sure." D. Ex. 78, Riddle Dep. 88:21-90:11.

**84.** No chemistry forensic scientist at KBI was ever placed on remedial training after completing initial training between 2000 and 2025. P. Ex. K, Henderson 30(b)(6) Dep. 69:5-15; D. Ex. 76, Knox Dep. 79:19-24, 142:15-18; D. Ex. 78, Riddle Dep. 90:24-91:3. Riddle admitted a narrower program was never considered: "Q. Did you consider a narrower remedial training program? A. No, we did not." The goal was to "eliminate that excuse." D. Ex. 78, Riddle Dep. 29:23-30:9.

**85.** Asked to identify "each person" in the Chemistry Section "who has had to go through retraining from 2005-present," KBI answered under oath: "Only Plaintiff Deborah C. Broil meets the criteria for this question." D. Ex. 82, Interrog. No. 10.

## IV. LEGAL STANDARD

Summary judgment is proper only when the movant shows there is "no genuine dispute" about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence and draws inferences "in the light most favorable to the non-movant," here Broil, *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010)); its "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); and competing evidence on a point defeats the motion. *Long v. Alpha Media, LLC*, No. 24-2400-DDC, Doc. 48 at 17 (D. Kan. Nov. 6, 2025).

## V. ARGUMENTS AND AUTHORITIES

### A. A Reasonable Jury Could Find that KBI Retaliated Against Broil for Complaining of Discrimination (Count III).

A plaintiff may prove retaliation with direct evidence or through the *McDonnell Douglas* framework, by showing that the employer's stated reason is a pretext for retaliation. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015). The prima facie case requires "'(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'" *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)).

KBI does not dispute that Broil complained to her supervisor on November 10, 2021, that she filed two charges of discrimination, or that it knew of both. Def. SOF 147; PSOF 79. It concedes that the retraining program, the special reviews, and the termination "likely collectively constitute an adverse action." Doc. 120 at 33. What KBI contests is whether the November complaint counts, whether too much time passed, and whether its reasons were legitimate, the last in a single paragraph that "adopts its above briefing." *Id.* at 38-39. The record answers all three. One fact frames all of it. The training Broil asked for was on KBI's own systems and equipment - LIMS, LAMS, Qualtrax, and LCUVMS - and the only gap KBI's designee could name was LIMS and Qualtrax. Def. SOF 76; PSOF 53; RDSF 79, 83. In its full remedial training program KBI gave LIMS and Qualtrax one week each, the two weeks she requested, and then spent eighteen weeks, August 15 through December 19, drilling a chemist with more than sixteen years of experience on sampling, spot tests, and the seven drug classes she already held work authorizations for, in which no one could find a single error. D. Ex. 11, OAG2098; PSOF 41, 52, 65.

**1. Broil's November complaint is protected activity under Title VII.**

Protected opposition requires that the employee "convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008); *Iweha v. Kansas*, 121 F.4th 1208, 1233-34 (10th Cir. 2024). No magic words are required, and the employee need not prove an actual violation; she must hold "a reasonable good-faith belief that she was opposing discrimination." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018); *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1262-63 (10th Cir. 2021).

On November 10, 2021, Broil sat down with her supervisor, Christa Knox, and reported that Jim Schieferecke had joked about a "negro virus" being created and had shown her a video of a man masturbating, which she had already reported to Assistant Laboratory Director Mary

Henderson. PSOF 7-9. It was not the first time she tried. In June 2021 she went to HR to report a hostile work environment and was told "no complaint will be taken and no file has or will be made/kept." PSOF 9A. Knox admitted under oath that these were complaints of racial discrimination and sexual harassment, and that the conduct, if it occurred, would violate KBI policy. PSOF 10. So did Price, who recommended her termination: the "negro virus" remark would "[a]bsolutely" violate KBI policy, and so would a male employee giving a female coworker a DVD with a masturbation scene. PSOF 10B, 10C. KBI's own supervisor called the complaint what it was. KBI now asks this Court to call it something else, and to do so as a matter of law.

KBI relies on this Court's ruling that the pleaded hostile-work-environment allegations were insufficient. Doc. 37 at 20. That ruling decided what the pleading stated, not what a reasonable employee believed on November 10, 2021, and *Fassbender*, KBI's own authority, holds that she "doesn't need to show that she reported an actual Title VII violation." *Fassbender*, 890 F.3d at 890. This Court applied that rule in *Hale*, where a complaint about a single written racial epithet supported a reasonable, good-faith belief, because evidence of that word is the kind courts leave to the jury rather than reject at summary judgment. *Hale v. Emporia State Univ.*, 2018 U.S. Dist. LEXIS 192564, at *30 (D. Kan. 2018). "[P]erhaps no single act can more quickly alter the conditions of employment than the use of an unambiguously racial epithet such as nigger ...." *Id.* Broil was not alone in hearing it: Royel testified that Schieferecke referred to Broil as "a black bitch and a nigger," and that no one at KBI ever asked her about it. PSOF 12A.

Her May 5, 2022 charge and May 31, 2022 amended charge, which KBI received on May 16 and June 2, are protected activity, and KBI does not argue otherwise. Def. SOF 147; PSOF 79.

**2. The retraining, the special reviews, and the termination are materially adverse.**

"[A]n action is 'materially adverse' if it is sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity." *Kincaid v. Unified Sch. Dist.*

*No. 500*, 645 F. Supp. 3d 1134, 1162 (D. Kan. 2022). Three adverse actions are at issue: the retraining program, PSOF 44; the 90-day and 30-day special reviews, Def. SOF 94, 96, 111; and the December 5, 2022 termination, Def. SOF 129. This Court has already held the retraining adverse "because plaintiff has alleged a plausible and direct connection between that remedial training and plaintiff's termination," Doc. 37 at 25, and termination qualifies: "Indeed, if it didn't, what could?" *Id.* at 24 (citing *Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1339 (10th Cir. 2025)). KBI now concedes the three together are "likely" an adverse action. Doc. 120 at 33. Its own witnesses describe the special review for what it is: Knox testified that it is "part of our disciplinary process" and that she had never placed any other employee on one, and KBI's HR designee testified that a special "is often called a PIP." PSOF 70. The other acts KBI addresses are motive and pattern evidence, not adverse actions.

**3. Causation: KBI answered Broil's complaint within fourteen minutes and did not stop until she was gone.**

Retaliatory motive "may be inferred when an adverse action closely follows protected activity," and a six-week interval suffices by itself. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). Where the interval is longer, "the passage of time does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes the retaliatory motive," *Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007), including a "pattern of retaliatory conduct" that "begins soon after the filing of the ... complaint and only culminates later in actual discharge." *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). This Court applied that framework here, holding that KBI's "failure to follow its own policy in imposing training requirements on plaintiff does suggest that discriminatory animus was afoot." Doc. 37 at 25-26.

Fourteen minutes after Broil's complaint reached her, Henderson wrote to Knox: "While I do feel the issue in the lab needs to be addressed by management. There are additional issues that

will have to be addressed by [Plaintiff].” PSOF 13. One month later, on December 10, 2021, Henderson sought permission to record her conversations with Broil because Broil “has brought forth a number of complaints,” something she had never sought for any other employee, and the same day the Associate Director wrote, “Mary believes we may be in pre-litigation posture with her.” PSOF 14. Broil had filed no charge. She had filed no lawsuit. She had complained.

Forty-one days after the complaint, Knox required Broil to take Fred Pryor classes, and she later assigned Broil, and no one else, the one titled “Dealing With Difficult People.” PSOF 15; RDSF 51. Her December 21 annual review rated her “Meets Expectations” overall but marked attitude and communication as needing improvement, and when Broil asked why, Knox answered in writing that she was “defensive” and “not forthcoming with all the information in incidents that occurred with Jim Schieferecke,” the incidents she had reported as discrimination. D. Ex. 28; PSOF 18. The first negative labels KBI ever put on Broil were tied to her complaint.

Before the complaint, mistakes were routine. In March 2021 Riddle told Broil, “We have all had to do amended reports,” and in June 2021, when a misspelling was found on one of her reports, he answered that “it was decided that it did not warrant an amended report at this time.” PSOF 31, 32. Then KBI went looking. In March 2022 Riddle asked Broil’s three peer reviewers for “any tech review concerns.” PSOF 19. Each answered with praise; Royel wrote, “I have nothing negative to say as there are no quality issues that should be of concern.” PSOF 20. Riddle now says other chemists sent him “a lot” of concerns, which he defines as “even one or two” and cannot date, and KBI, asked under oath to identify every formal or informal complaint about her performance, listed none from any chemist. PSOF 22, 23. Three days after Royel’s answer, Riddle told Price and Knox that Broil “likes to ‘play the victim card,’” and Price, while writing that he was “NOT CONCERNED w/ her work product,” directed them to “recommend documenting and

T.R. issues and revisit in 30 days." PSOF 26. On March 15 Knox pulled Broil's training portfolio for Price, which she had done for no other employee, and on March 16 Price told Knox to "proceed with… monitoring [Plaintiff's] work through technical review and documenting anything that is not meeting our standards." PSOF 28, 29. No problem with her work. A plan to find one.

On May 9, 2022, Price directed Knox and Riddle to "CONTACT HR AND PROCEED W/ A SPECIAL EVALUATION," on grounds that said nothing about her casework: she was "late to the 'huddle' mtgs," she "isolates from group," and a jury-duty timesheet Knox had already approved, PSOF 30, 33, while Knox's own tracker that day read "Case File Review Nonconformities: None to date." RDSF 59-60. KBI received Broil's charge on May 16 and her amended charge on June 2. PSOF 79. On June 27 KBI's own notes recorded, "Do not put her on the special – pure #'s don't support it," and "TL [Price] does not support the special at this point." PSOF 50.

On July 28, 2022, fifty-eight days after the amended charge, KBI did what its own notes said the numbers did not support. On the same day its mid-year review found Broil "meeting expectations" on the reports she authored and "exceeding expectations" on the reports she reviewed, KBI pulled a chemist with more than a decade of experience off casework, sent her back through the entire new-employee training program, and put her on a 90-day special review. PSOF 36, 42, 44, 58; Def. SOF 77, 96; RDSF 90. Then it set her up to fail: less time per module than other trainees receive, materials that did not exist when the deadlines began to run, and a peer reviewer ordered not to answer her questions. PSOF 56, 57, 59, 61; RDSF 103, 105, 113-116.

On October 18, eleven days before the 90-day review ended, Knox sent Riddle a draft closeout already marked "Unsat." PSOF 67. A 30-day review followed. Def. SOF 111. On November 15, eleven days before that review closed, KBI's notes record "Termination Paperwork

before Thanksgiving," kept from Broil because the discussion "would be distracting to DC and hinder her training." PSOF 71. KBI terminated her on December 5, 2022. *Id.* The ending was written before the reviews that supposedly produced it were over.

This is the *Marx* pattern: conduct that "begins soon after the filing of the ... complaint and only culminates later in actual discharge." *Marx*, 76 F.3d at 329. It began fourteen minutes after the complaint, and its first two steps, the recording request and the "pre-litigation posture" note, name her complaints as the reason. PSOF 13, 14. Nothing like it happened before November 10, 2021: no special review, no retraining, no write-up. PSOF 23, 70, 84. Take the complaint out of this timeline, and nothing in KBI's own account explains why this chemist, alone in twenty-five years, was retrained from the beginning and fired for missing dates no one else was held to. PSOF 41, 68, 69, 84, 85. A jury could find retaliation was the but-for cause. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Every actor knew. Knox received the complaint. She then decided on the retraining with Riddle, told him which modules to include, set its target dates, and approved it, exactly as QM-12 contemplates, which assigns remedial training to "the supervisor and/or technical leader." PSOF 7, 39, 48, 49, 55. Riddle, the technical leader, was not Broil's supervisor and could not impose the program without one; as he put it, "Christa approved it." PSOF 27, 49. Knox and Riddle made both special-review decisions, PSOF 47, and Price, who recommended the termination, knew of her charge. PSOF 78. Knox testified that she and Riddle talked about Broil's charges of discrimination, PSOF 45, though Riddle says he heard nothing of any complaint until after she left, a conflict only a jury can resolve. PSOF 46. Director Thompson, who signed the termination letter, testified, "I can't imagine that I was not aware at the time that I signed this letter terminating her employment." PSOF 74. He reviewed no documents and asked no question to make sure the

termination was not retaliatory; the decision "came to me as far as a kind of a verbal briefing," with "a draft letter" he "would then adopt," and he took his managers at their word: "You trust the people." PSOF 73, 77; RDSF 130. Thompson did not decide. He signed. KBI's sworn answers name Knox, Riddle, and Price as the people with knowledge of the matters on which the termination was based and state that Thompson "had only indirect knowledge." PSOF 75. A subordinate's motive is the employer's when the decisionmaker "followed the biased recommendation of a subordinate without independently investigating the complaint against the employee." *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 485 (10th Cir. 2006) (quotation cleaned up), as quoted in *Long*, Doc. 48 at 16 (decisionmaker asked for no proof and called no one to verify). Knox's and Riddle's motive is not assumed; it is in their own words. Knox tied Broil's first negative review to the "incidents that occurred with Jim Schieferecke" that Broil had reported, and Riddle said she "likes to 'play the victim card'" and built the program to "eliminate that excuse." PSOF 18, 26, 84. Thompson asked for nothing and verified nothing. PSOF 73, 77.

**4. KBI's reasons are pretext: the retraining violated its own policy, its own reviews contradict the performance claim, its reasons shifted, and the outcome was written before the reviews ended.**

A plaintiff shows pretext by "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's stated reason such that a rational trier of fact could find it unworthy of belief. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) (citing *Morgan v. Hilti Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). Pretext is also shown when the employer "acted contrary to a written company policy prescribing the action to be taken," *id.* at 1119 (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)), by "disturbing procedural irregularities," *id.* at 1122, and by "[s]hifting or inconsistent explanations." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020). KBI says

Broil had "work deficiencies" that required the retraining and the special reviews. Doc. 120 at 38. The record has every kind of pretext evidence the Tenth Circuit recognizes.

First, the retraining violated KBI's own written policy. QM-12 § 6.6 requires the full basic program only upon "[f]ailure to successfully complete the individualized training plan"; § 9.2 confines "the prescribed basic training" to "any analyst entering a new discipline or sub-discipline"; and § 9.1 requires remedial training to be "based on the circumstances requiring the remedial training." PSOF 39. Neither condition existed. Broil completed her individualized program, with all four required signatures, and was never told she failed it. PSOF 4, 5. She held work authorizations, which KBI does not issue until initial training is complete. PSOF 3, 6. In twenty-five years no other chemist was sent back through the full new-employee program after completing initial training, and KBI answered under oath that "[o]nly Plaintiff Deborah C. Broil meets the criteria." PSOF 84, 85; RDSF 145.

Nor did any circumstance require it. KBI's designee agreed that KBI "couldn't find a single actual issue that she actually demonstrated having as it relates to conducting any of these drug analyses." PSOF 41. Riddle admitted she had no issues with any drug class and that no policy required her to repeat new-employee training. PSOF 42. Riddle never considered a narrower program; the goal was to "eliminate that excuse." PSOF 84.

The only gaps anyone could name were two software systems, LIMS and Qualtrax, and they were in no one's training: "[t]here wasn't a separate training for LIMS," and that "was evidently not sufficient, so we then built training for her." PSOF 53. Once she was "taught or shown how to appropriately use LIMS," she addressed her non-conformities. PSOF 53. The program gave those two systems one week each and spent twenty-one of its twenty-eight weeks on drug classes she already held work authorizations for. PSOF 52. Broil asked for the training she

lacked, was given the training she did not need, and was fired for not finishing it on dates no one else was held to.

Second, KBI's claim that Broil was performing poorly is contradicted by its own paper. The mid-year review signed July 28, 2022, the day the retraining was imposed, found that she had "authored an average of 27.3 reports per month (meeting expectations) and reviewed an average of 31.9 reports per month (exceeding expectations)." PSOF 36. Price conceded she was meeting or exceeding expectations in her casework when KBI put her on the retraining, and HR's own notes of that meeting read "EXCEEDING expectations." PSOF 37, 38. Her December 2021 annual review, the same review that first criticized her attitude, still rated her "Exceeds Expectations" in monthly case files reviewed and "exceptional" on amended reports, and every annual review she received rated her "Meets Expectations." PSOF 34; RDSF 31-32. Three weeks before the retraining, Riddle congratulated her on passing her annual proficiency test: "Good job! You make me proud to work alongside of you." PSOF 35. A jury could find a performance reason that KBI's own reviews reject unworthy of belief.

KBI then says it fired Broil for unsatisfactory special reviews and for failing to finish the program. Doc. 120 at 38. KBI built a program she would not finish: less time per module than other trainees receive, PSOF 56, 57, and, although KBI now says testing out carried no penalty, a 90-day review that held a failed test against her. RDSF 91. And the program was not bench work. Each module meant "material of over 200 pages and an exam of only eight to 10 questions, of which I must score 90%." RDSF 91. When Broil asked for a formula, Riddle called it "spoon feed[ing]," though he neither has it memorized nor uses it, and Knox lent Broil her college textbook to find it; Broil alone had to "bring a solution & why before Chris answers." RDSF 103, 105, 113-116. When she asked which references to use for a module question, Riddle, KBI's technical

leader, sent her to Erowid, a drug-user message board he himself called "not exactly scientific" and "a druggy website," a source no high school teacher would accept in a research paper. PSOF 62.

Broil knew what was riding on it. Of the July 28 meeting she testified, "I was scared to death," "I just knew they were trying to get rid of me," and "I was terrified and I felt like they were setting me up for failure"; when she tried to tell them the program would not work in her favor, "it was rejected and I felt punished." PSOF 44A. She wrote at the time, "[i]f I am not able to complete the Stimulant Module . . . you will evaluate me as unsatisfactory." RDSF 91. She was right: the 90-day review had defined failure, before the program began, as not passing every module by its date, and the two unsatisfactory reviews are the reasons KBI gives for firing her. PSOF 51; Doc. 120 at 38. The one test she failed in the whole program was the one KBI gave her before it gave her the materials; she passed it once they arrived, and the review counted the failure against her anyway. PSOF 59, 60; Def. SOF 97; RDSF 91. She passed five of the seven modules the review required. Def. SOF 106. KBI had never put a working chemist through this program after initial training. PSOF 84, 85.

And while KBI tells this Court she could not finish a new-employee program, it put her on the stand as its expert in two criminal trials inside the same 90-day review. PSOF 64. Riddle, the program's designer, rated both appearances four out of five, writing of the first, "16 yrs experienced in drug analysis ... No concerns," and Knox rated it "satisfactory." PSOF 65. All the while, KBI certified her work to Kansas courts as that of an analyst who had "completed the appropriate training protocols and proficiency tests." PSOF 66. No employer that honestly believed a forensic scientist could not be trusted to analyze drugs puts her on the stand as its expert

in two criminal drug prosecutions during the same review in which it says she was failing. KBI cannot vouch for Broil to a criminal jury and disown her to this Court.

KBI's last ground is attitude, the most subjective grade on the form, and its own witnesses take it apart. Every attitude rating Broil received before she complained was "Exceeds Expectations." Worley, her first supervisor, found her "very pleasant," "always positive," and "very receptive" to suggestions, and recalled no attitude issue at all. PSOF 25. Knox wrote in 2020 that "[t]his positivity rubs off on your co-workers as well." PSOF 72. Only after she complained did attitude become a ground for the special reviews, PSOF 30, 72, yet Riddle testified he had no complaint about her personality, demeanor, or interactions: "[t]he only thing I dealt with was just technical issues." PSOF 72. KBI's own example proves the point. The 90-day review graded her attitude Unsatisfactory for "claiming you were not provided all the information needed until after taking and not passing a test," RDSF 91, which Price confirmed in writing was true: "she was not given all of the necessary information for the LIMS assignment until she had already taken the test over the material." PSOF 60. Reporting a problem KBI's own Director confirmed is not an attitude problem. This Court views subjective assessments of an employee's attitude with skepticism. *Hobbs v. Sunflower Bank, N.A.*, No. 24-2287-DDC, Doc. 58 at 15-16 (D. Kan. Oct. 31, 2025).

Third, KBI's explanations shifted. *Frappied*, 966 F.3d at 1059. Price ordered the special review in May on grounds that had nothing to do with casework. PSOF 30, 33. In June KBI's own notes recorded that the numbers did not support it. PSOF 50. In July KBI imposed it anyway on a third ground, deficient training, which its designee could not identify under oath. PSOF 41, 44. Three reasons in eleven weeks, each discarded for the next. A jury could conclude that KBI made the decision in May and spent the summer looking for a reason.

KBI had its mind made up before the process ran. KBI drafted the training form and the

review that would grade it together, nine days before Broil saw either, with failure already defined. PSOF 51. Knox wrote of the target dates, "I just threw in the 18th so we had something to work with," and Riddle admitted his were "just a bunch of random dates that were thrown out just to have some dates." PSOF 54, 55. The day after the first module was due, the QA Manager wrote, "I don't know how we can use/grade this as it stands." PSOF 59. KBI drafted the failing closeout before the 90-day period ended and ordered the termination paperwork before the 30-day period closed. PSOF 67, 71. And it held her to target dates that its own designee testified are not requirements for any employee and that had never cost anyone else a job. PSOF 68, 69. KBI did not measure Broil against a standard. It built one she was meant to miss. A jury could find each reason unworthy of belief.

Nor can KBI hide behind honest belief. The question is whether KBI honestly believed its reasons and acted in good faith on them. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118-19 (10th Cir. 2007). KBI cannot claim an honest belief in a reason its own notes rejected a month before it acted. PSOF 50. An employer cannot honestly believe in a rule its own designee swears does not exist. PSOF 69. And KBI largely rests its facts on four declarations its managers signed in July 2026, after discovery closed; where those declarations contradict the declarants' own depositions, the Court disregards them. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). Henderson's claimed, "lack of confidence" appears only in her declaration; asked what role she played in the decision, she testified, "I didn't." RDSF 130. Price's deposition reason for the program appears in no recorded meeting. RDSF 79. Broil corrected her own testimony the way the rules provide, by a timely Rule 30(e) errata served with KBI's agreement, P. Ex. AF; KBI's managers rewrote theirs by declaration, after the record closed. A reasonable jury could find that KBI's reasons are pretext and that retaliation was the but-for cause of the retraining, the special

reviews, and the termination.

**B. A Reasonable Jury Could Find that KBI Discriminated Against Broil Because of Her Sex (Count II).**

**1. Broil was qualified: KBI's own reviews said so, and it used her as its expert during the special review.**

KBI argues that Broil was not qualified because she could not finish the retraining and borrows Fourth Circuit law to make "qualified" an element of the prima facie case. KBI's own paper answers that. The mid-year review signed the day the retraining was imposed found her meeting and exceeding expectations, and HR's notes of that meeting read "EXCEEDING expectations." PSOF 36, 38. Price had written that he was "NOT CONCERNED w/ her work product," KBI's designee "couldn't find a single actual issue" in her drug analyses, and during the special review KBI now calls a failure it put her on the stand as its expert in two criminal trials, with Riddle rating her "No concerns." PSOF 26, 41, 64, 65.

The qualification argument belongs in the pretext analysis, and this Court has refused the same move before, declining to import an out-of-circuit "legitimate business expectations" element into the prima facie case. *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, No. 18-2664-DDC, Doc. 55 at 39 (D. Kan. May 18, 2020) (ADA). It fails there for the reasons in Part A.4: the retraining violated KBI's written policy, addressed no deficiency its designee could name, gave Broil less time per module than other trainees, and withheld the materials she needed to pass the first test. PSOF 41, 44, 56, 57, 60.

**2. KBI treated Broil less favorably than her male comparators: Schieferecke was not required to attend the Fred Pryor training, and Riddle, after an audit finding, was retrained on one topic.**

Two elements are at issue. First, a Title VII plaintiff need show only "some harm" to an identifiable term or condition of employment, *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024); a mandatory retraining program and a termination are both far past that line. Second, the

men she compares herself to must be similarly situated, meaning they "deal[] with the same supervisor and [are] subject to the same standards governing performance evaluation and discipline." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000); see *Fisher*, Doc. 55 at 49. Both are. Schieferecke reports to Knox, the supervisor who assigned Broil the class, and Riddle's retraining was imposed under the same QM-12 remedial-training policy KBI invokes here. PSOF 12B, 39, 83.

Broil reported Schieferecke for sexual harassment, and in May 2021 he yelled at her in a dispute over a shared instrument, loudly enough that "people in the wet lab and hallway could hear him."PSOF 7, 9-11; RDSF 140. Another female employee confirmed that Schieferecke yells and is disrespectful. PSOF 12. KBI retrained the woman who complained and left the man alone.

Forty-one days after Broil's complaint, Knox required her to take Fred Pryor classes, and on February 23, 2022, Knox assigned her "Dealing with Difficult People," a class no one else at KBI has been required to take. PSOF 15; RDSF 51. Schieferecke, the one who yelled, was not required to take Fred Pryor or any training on working with co-workers. PSOF 16; RDSF 51, 135. Knox "did not discipline [Schieferecke] other than to let him know in the conversation that it was unacceptable behavior," and Schieferecke confirmed that he has never been counseled, written up, suspended, or otherwise disciplined in his career at KBI. RDSF 135. The instrument reassignment KBI calls discipline applied to Broil too. Def. SOF 135, 137. Knox knew of no investigation of Broil's complaint. PSOF 10A. No one accused Schieferecke of withholding information about the incidents. KBI accused Broil of not being "forthcoming with all the information in incidents that occurred with Jim Schieferecke," the same incidents she had reported as race discrimination and sexual harassment on November 10, 2021. PSOF 18. The woman who complained was corrected. The man she complained about was not.

Schieferecke's record went well beyond a yell. He raised his voice at Knox, his own supervisor, "a few" times, which she agreed was inappropriate and disrespectful, and she believes he has raised his voice in team meetings. PSOF 12B. He referred to Broil, in Royel's presence, as "a black bitch and a nigger," words KBI admits violate its policies, and no one at KBI ever asked Royel about it. PSOF 12A. Knox "coached" him and assigned him nothing: "I just haven't." PSOF 12B. He has never been counseled, written up, or disciplined. RDSF 135. Broil, whom Royel never heard yell at anyone, PSOF 12A, and against whom no chemist had complained and no error in her drug analyses could be found, PSOF 22, 23, 41, was the one assigned "Dealing With Difficult People," had her training portfolio pulled for the Director, and was monitored "through technical review" for anything "not meeting our standards." PSOF 15, 28, 29; RDSF 51. The policy violations were his. The investigation was of her.

The retraining followed the same pattern. Part A.4 shows it was unjustified and loaded with modules Broil did not need. Riddle, a man, was retrained once, early in his career, after an audit found an actual problem with his evidence marking; he was retrained on one topic, for one month, and that was the end of it. PSOF 83. Broil, with no finding against her, was put through the full basic program, and it ended in her termination. PSOF 41, 44.

A reasonable jury could find that the retraining and the termination occurred under circumstances giving rise to an inference of sex discrimination.

**3. The same evidence shows KBI's reasons are pretext for sex discrimination.**

The pretext showing in Part A.4 applies here with equal force: the retraining violated KBI's written policy, KBI's own reviews contradict its performance claim, its reasons shifted, and it wrote the outcome before the reviews ended. Two facts are specific to sex. KBI required Broil, and no man, to take "Dealing With Difficult People," while Schieferecke, the man who yelled at her, received a conversation and no training or discipline of any kind. PSOF 15, 16; RDSF 51,

135. And KBI retrained Riddle, a man, on one topic for one month after an audit found an actual error, but put Broil, with no finding against her, through the full basic program. PSOF 41, 44, 83. A jury could find those reasons unworthy of belief.

### C. Broil exhausted her administrative remedies: every act on which Counts II and III rest falls within a timely charge.

KBI renews exhaustion only as to acts more than 300 days before the May 5, 2022 charge, that is, before July 9, 2021. Broil seeks no recovery for those events; she relies on them as background evidence of what she complained about and what KBI knew. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). Every act on which Counts II and III rest is timely: the November 10, 2021 complaint, the December 2021 recording request and review, and the March 2022 solicitation fall within 300 days of the May 5, 2022 charge, amended May 31, 2022, PSOF 79; the retraining, both special reviews, and the December 5, 2022 termination fall within 300 days of the February 8, 2023 charge, which alleges them in terms, PSOF 80; and Broil sued within ninety days of the October 24, 2023 right-to-sue letters. PSOF 81; Doc. 1; Doc. 113, stip.

## VI. CONCLUSION

KBI answered a complaint of discrimination in fourteen minutes and did not stop until the chemist who made it was gone. Its own notes rejected the special review, its own reviews rated her work as meeting and exceeding expectations, its own policy did not permit the retraining, and Kansas courts heard her as KBI's expert while KBI graded her a failure. KBI meets those facts with declarations written after discovery closed. That is a jury's case. Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety and hear oral argument.

Respectfully submitted,

**Baldwin & Vernon Trial Attorneys, LLC**

By: /s/ ***Erin N. Vernon***
Erin N. Vernon, KS Bar No. 25792
Sylvia Hernandez,78914
108 S Pleasant St. Independence, MO.
Tel: (816) 842-1102;
Erin@bvtrialattys.com
**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was transmitted via CM/ECF electronic filing this 24th day of September 2026, to all counsel of record.

*/s/ Erin N. Vernon*